**WASHINGTON FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff,**

v.

**FEDERAL HOME LOAN BANK BOARD, et al., Defendants.**

No. C80–443.

United States District Court, N. D. Ohio.

July 17, 1981.

---

William D. Ginn, Timothy F. McMahon, David J. Hooker, Richard Van M. Krotseng, Thompson, Hine & Flory, Cleveland, Ohio, Arthur W. Leibold, Jr., Dechert, Price & Rhoads, Washington, D. C., for plaintiff.

James Smith, John E. Lynch, Jr., Squires, Sanders & Dempsey, Cleveland, Ohio, Lawrence W. Hayes, Associate Gen. Counsel, Federal Home Loan Bank Bd., Washington, D. C., Paul L. Csank, Csank, Csank & Coaxum, Cleveland, Ohio, for defendants.

MEMORANDUM AND ORDER

WILLIAM K. THOMAS, Senior District Judge.

Late in the afternoon of March 18, 1980, the Federal Home Loan Bank Board (FHLBB or Board) appointed the Federal Savings & Loan Insurance Corporation (FSLIC) as receiver for Washington Feder-

al Savings and Loan Association of University Heights, University Heights, Ohio (Washington Federal). In its resolution (80–181) appointing the receiver, the Board determined that grounds existed for the appointment pursuant to section 5(d)(6)(A) of the Home Owners' Loan Act of 1933 ("HOLA"; 12 U.S.C. 1464(d)(6)(A)), specifically:

(1) Washington Federal is in an unsafe and unsound condition to transact business in that it is unable to meet its liabilities or obligations; and

(2) the assets of Washington Federal have been substantially dissipated due to violations of law or regulations and to unsafe or unsound practices.

Later on March 18, by resolution 80–182, the Board authorized the FSLIC as receiver for Washington Federal to sell and transfer certain assets and liabilities to Broadview Savings & Loan Company (Broadview) memorialized by a purchase and assumption agreement. In the same resolution, the Board authorized the FSLIC as receiver to enter into an agreement of sale with the FSLIC in its corporate capacity, pursuant to which the FSLIC as receiver would sell to the FSLIC as corporation certain assets. The corporation would assume certain liabilities of Washington Federal which Broadview did not purchase or assume.

Resolution 80–183 adopted by the Board authorized the FSLIC as corporation to enter into an indemnity agreement with Broadview and the agreement of sale with the FSLIC as receiver.

Representatives of the Board and the FSLIC as receiver on March 18 served "papers" on Washington Federal (presumably 80–181), and employees of Broadview on March 18 took over the main office and branches of Washington Federal on the same day.

Washington Federal filed this action on March 27, 1980 and its amended complaint on April 22, 1980. It rests jurisdiction in part on 12 U.S.C. § 1464(d)(6)(A). In its first cause of action, Washington Federal alleges that the findings of the Board on which the Board based the appointment of the FSLIC as receiver "were clearly erroneous and unsupportable and there were no other facts on March 18, 1980 justifying the FHLBB's action." Washington Federal asserts that:

The ex parte action of the FHLBB in declaring an involuntary receivership for Washington Federal and appointing the FSLIC as the receiver was arbitrary and unreasonable, not supported by valid findings or motivated by proper purposes, and in excess of the FHLBB's authority under 12 U.S.C. § 1464(d)(6)(A).

Washington Federal seeks a mandatory injunction

directing the FHLBB to remove the FSLIC as receiver and to dissolve the receivership and ordering the FHLBB, the FSLIC and Broadview to rescind all actions taken pursuant to the receivership, to reconstitute Washington Federal's business, and to restore to Washington Federal and its depositor owners all of their assets improperly taken from them.

Defendants Bank Board and the FSLIC in their answer, filed June 6, 1980, denied all allegations not admitted to be true and requested dismissal of Count I of the amended complaint. On the same day, defendants moved to dismiss Counts II through X, inclusive, of the plaintiff's amended complaint. This court on August 8, 1980 severed Count I from Counts II through X, ordering the separate trial of Count I.

On December 18, 1980 this court entered a memorandum and order which established the standard of judicial review and placed the burden of proof. In part, it was concluded:

The ultimate issue in the trial of this case is whether Washington Federal has sustained the burden of proving that the Board abused its discretion in reaching its "opinion" that a receiver should be appointed....

Manifestly, if Washington Federal shows by a preponderance of the evidence that the Board acted arbitrarily and ca-

priciously, then it has established that the Board abused its discretion.

Testimony and exhibits were received at the trial, which lasted from January 5 through February 12, 1981. Following written submissions and oral argument, the case was taken under advisement on May 25, 1981.

## I.

## A.

Under section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, a court that reviews agency action is directed to "review the whole record or those parts of it cited by a party." *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), a review of informal agency action of the Secretary of Transportation, prescribes that the "whole record" shall be "compiled by the agency" and that this is the "basis for review required by § 706 of the Administrative Procedure Act." *Id.*, at 419, 91 S.Ct. at 825.

■■ The scope of judicial review determined to apply in this case coincides with the language of section 706(2)(A):

The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . .

Nevertheless, section 706's requirement that the administrative agency compile the administrative record, interpreted in *Overton Park*, is a general statute that does not apply here. Instead, 12 U.S.C. § 1464(d)(6)(A), under which Washington Federal brings this action, controls. In relevant part it provides:

In the event of [the appointment of a conservator or receiver for a savings and loan association], the association may, within 30 days thereafter, bring an action in the United States district court . . . for an order requiring the Board to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Board to remove such conservator or receiver.

As seen, the statute gives no guidance concerning the nature or composition of a judicial record that is developed in an action brought under this provision; and there has been no prior judicial interpretation of this language.[1]

■ Provision for a district court action perforce allows for the calling of witnesses and the development of a factual judicial record.[2] What, then, is the permissible content of the administrative record developed in an association action challenging the Board's appointment of a receiver? In its memorandum of December 18, this court required the Board to "assume the initial burden of placing on the record the factual results of any investigation or analysis of the financial condition and business practices of Washington Federal and any other findings upon which the Board based its opinion." In effect, the Board was directed to call witnesses and produce exhibits that would reconstruct the administrative record.

The right to prosecute this action enables the association to develop all of the facts that bear upon the merits of the issue to be decided by the court. It is in this sense then that the statute states, "The court shall upon the merits dismiss such action or direct the board to remove such conservator or receiver." Given this purpose, "upon the merits" is not subject to the construction that it grants a trial *de novo* with the "opinion" of the Board wiped clean.

---

1. The court is advised that this is the first receivership initiated by the Board since the Financial Institution's Supervisory Act of 1966 (FISA) (P.L. 89–695, 80 Stat. 1028) rewrote section 1464(d)(6)(A). Former section 1464(d) provided for an administrative hearing and thus an administrative record on the Board's application for appointment of a supervisory representative in charge (conservator). FISA's repeal of this section abolished the procedure of developing an administrative record.

2. In this court's memorandum and order of December 18, 1980, in construing the statutory language, the court held:

■ The parties agree, and it is ruled, that the administrative record should include the transcripts of the verbatim tapes of participants' oral statements and proceedings of the Board meetings held on March 14, March 17, and March 18, 1980. Beyond that, there is dispute over the admissibility of oral statements as part of the administrative record.

During the trial, plaintiff challenged the inclusion in the administrative record of the testimony of staff members recounting any briefing session held preceding a Board meeting and attended by Board members, their assistants, and staff members. The issue arose during the testimony of Thomas Timmins, deputy director of the Board's Office of Examination and Supervision (OES).[3] It was ruled, "Mr. Timmins may testify and others may testify in terms of what went on in the briefing session...." Thereupon, Mr. Timmins was permitted to testify as to his input into the briefing session on the morning of March 14, 1980, both as to what he said and also as to any documentary materials which he took to the briefing session. While Mr. Timmins and other persons attending the briefing sessions were permitted to testify as to their own statements, none was permitted to report what others said at the briefing session.

In a post-trial brief, Washington Federal specifically argues that oral recollections of Bank Board witnesses who testified as to what they said at the briefing sessions "are not a part of the administrative record and may not form the basis upon which the bank board acted." Defendants counter by saying that the authorities reviewed

demonstrate that in informal decision-making, an agency has the right to rely on its staff in compiling information, and that the information reviewed by staff prior to the staff's communication of its recommendations to the decision makers constitute an appropriate part of the administrative record.

Washington Federal relies primarily upon language from *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 54 (D.C.Cir.1977), which Washington Federal says defines the "administrative record" as the "body of material—documents, comments, transcripts, and statements in various forms declaring agency expertise or policy—with reference to which [the agency decision-maker's] judgment was exercised." While the court thus defined the administrative record, it is important to note that at another point in the opinion, in part IV, "*Ex Parte* Contacts," the court makes it clear that even "*ex parte* comments" to commissioners may be an element of the administrative record. After observing that it could vacate the rules under review and "remand them to the Commission for consideration *de novo*," the court noted as one of the defects in this approach that "it is not possible for us to expunge from the Commission's collective memory what was said to it *ex parte*." *Id.*, at 58. Deciding that "it would be useful to remove any possible effect of the *ex parte* contacts in these proceedings," the court remanded the record to the Commission

... for supplementation with instructions "to hold with the aid of a specially appointed hearing examiner, an evidential hearing to determine the nature and

---

**3.** After counsel's argument, this court thus defined the issue:

So I think we have really two questions presented here: One is, how do you create the administrative record upon which this Board acted; and then we have to decide what indeed was the basis upon which the Board acted in terms of the reasons or explanations or findings if they made them—just what those were based on.

Subsequently, in an oral ruling, this court stated:

In any event, they held a session with the Board members, and how in the world you

could avoid getting this record, into this record—so I would know the full record of which the Supreme Court speaks [*Overton Park*]—I don't know, unless indeed we have every witness who knows anything about what went on at the briefing session testify, and of course, we don't need cumulative evidence, but we certainly need evidence of what went on and what records and documents were there and presented to the Board.

Now, that is the first question, and it is to that question that I think Mr. Timmins can address himself.

source of all *ex parte* pleas and other approaches that were made to" the Commission or its employees after the issuance of the first notice of proposed rulemaking in these dockets. [Citations omitted.]

*Id.*

An evidential hearing " 'to determine the nature and source of all *ex parte* pleas and other approaches that were made to' the Commission or its employees" conveys a pertinent message. Provided the *ex parte* comments of non-agency persons to members or employees of an agency are disclosed and identified, they may become part of an administrative record in an informal agency action. Broader than this court's ruling, *Home Box Office* supports this court's ruling. Here, only comments by staff members (no outsiders) to agency Board members are held to be part of the administrative record.

█ As ruled at trial, and now affirmed, staff comments to Board members at any briefing session, limited to what the staff member said, are included as part of the administrative record. The reasoning and holding of *Home Box Office* is also broad enough to approve inclusion in the administrative record of identified oral exchanges between staff members and chairman Janis.

█ Applying the foregoing ruling, this court holds that the administrative record includes the portions of the trial record which are designated in Appendix A.* The designated pages have been reproduced and are filed in the case. The court further holds that the administrative record includes the exhibits listed in Appendix B.* These exhibits are classified generally as (1) documents identified by one or more Board members as having been seen by him; (2) documents identified as having been sent to the Board; (3) resolutions adopted by the Board; (4) transcripts of Board meetings; and, (5) other documents relevant to actions taken by the Board.

* [Omitted for purposes of publication.]

B.

During the direct examination of Charles Glueck, chief executive officer of Washington Federal, a defense objection to a question led to a broad discussion of plaintiff's claim that the Board staff excluded from the administrative record and the Board's consideration information relating to a relevant factor, articulated as "the true condition of Washington Federal." Counsel for Washington Federal asserted:

As I understand the court's comment from the court's ruling, there has been a restriction placed on Washington Federal as to what information Washington Federal submitted to the Board.

After the court assured counsel that this was not the case, plaintiff's counsel continued:

I want to go beyond oral or written submissions, and that is the question I want to address.

This Court is hearing this case and judging whether the Federal Home Loan Bank Board considered the relevant factors and whether or not it abused its discretion, and that language comes right out of the *Citizens of Overton Park* case, and the first question is whether the Board considered the relevant factors.

\* \* \* \* \* \*

It was the obligation of the Federal Home Loan Bank Board in its regulatory process and before making a decision to make sure that it had the relevant factors before it.

Now, I think maybe that is the critical legal issue insofar as the testimony will show that just about every piece of information was fed to the Board, but I think we should make it clear that we want to be able to show to this court the true condition of Washington Federal, and then it is up to this court to conclude whether or not that condition was adequately described to the Board.

Now, that involves two things:

First of all, whether the staff took the information which it had in its possession and gave it to the Board; and second, whether the staff made an adequate investigation in the first place to know the condition, so it could describe it to the Board; and that is the issue.

■■■ Defendants' counsel did not immediately respond to the foregoing statements of plaintiff's counsel. In another context, counsel for the defendant took a position that is generally responsive to the quoted comment of plaintiff's counsel. Defense counsel stated:

... There [*Overton Park*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136] the Court was faced with a statute which required the Secretary to make all possible planning to minimize harm; and there is statutory language and statutory direction and statutory prerequisites to a particular finding on the part of the Secretary of Transportation.

There was another statutory direction in *Volpe* that the Secretary could not authorize the use of funds if a "feasible and prudent" alternative exists.

So that I think, I think that the question of the standard of review in a particular agency action must look to the statutory framework and the purposes and whether or not specific statutory directions or prerequisites are established before such action can be taken.

And if we look to the statutes governing here, 12 U.S.C. [§] 1464(d)(6)(A) and by stark contrast to the EPA context, and stark contrast to the kind of finding that these statutes require with respect to the Secretary of Transportation in the context of the *Volpe* case, the statute here is extremely broad.

For an opinion to be upheld, only there be need for a ground for the appointment of a receiver, and those grounds of course are set forth in the statute just mentioned.

In final argument, defendants' counsel added to the same argument. He said:

Your Honor, I think that we return to the relevant factors. We at no time have said—or if the Plaintiff believes we've said, we should like to clarify at no time did we intend to say that it isn't for the Court to say what the relevant factors are. We say that there is only one way a statute can be examined, and that is through the Court. The Court, of course, will say what the relevant factors are, and the Bank Board submits that the guideline for the Court must be the statute. In this case, 12 U.S.C. [§] 1464(d)(6)(A) is the relevant statute, and there is no relevant consideration except one, and that is[,] was there a ground, or were there more than one ground for an appointment of a receiver for Washington Federal on March 18, 1980.

Section 1464(d)(6)(A) lists five grounds for appointment:

The grounds for the appointment of a conservator or receiver for an association shall be one or more of the following: (i) insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members; (ii) substantial dissipation of assets or earnings due to any violation or violations of law, rules, or regulations, or to any unsafe or unsound practice or practices; (iii) an unsafe or unsound condition to transact business; (iv) willful violation of a cease-and-desist order which has become final; (v) concealment of·books, papers, records, or assets of the association or refusal to submit books, papers, records, or affairs of the association for inspection to any examiner or to any lawful agent of the Board.

The full statutory scheme displays a clear intent to confine the basis upon which a receiver may be appointed to "*one* or more" (emphasis added) of the five listed grounds. The next sentence bestows on the Board "*exclusive power* and jurisdiction to appoint a conservator or receiver." (Emphasis added.) The grant of exclusive power, however, is not construed to convey to the Board absolute power to decide whether a ground exists for appointing a receiver. As this court has ruled, this court must decide whether the Board abused its discretion in

reaching its opinion that a receiver should be appointed. Under *Overton Park, supra,* this court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."

■ It is essential to weld *Overton Park*'s "consideration of the relevant factors" and the "exclusive power" to appoint a receiver if one or more grounds exist, as section 1464(d)(6)(A) directs. Here are the welding rules. Factors are only relevant if they may be subsumed under "one or more" grounds that form the basis of the Bank Board's "opinion" to order a receivership. A relevant factor may be considered only in connection with the ground or grounds under which it is subsumed.

■ As seen earlier, the Board determined that two grounds existed for the appointment of a receiver for Washington Federal:

(1) Washington Federal is in an unsafe and unsound condition to transact business in that it is unable to meet its liabilities or obligations; and,

(2) the assets of Washington Federal have been substantially dissipated due to violations of law or regulations and to unsafe or unsound practices.

It is timely to settle one relevant factor now.[4] The "true condition" of Washington Federal is a factor that is relevant to and is subsumed under ground (1). Taking the next step, the relevant time period of the Association's true financial condition must be set. It is concluded that while earlier months provide a pertinent background[5] to ascertain the Association's true financial condition, the month of March 1980 is the time frame in which the true condition must be appraised. To show the background of the Association's true financial condition, the court has received into the judicial record evidence of Washington Federal's participation in the Government National Mortgage Association (GNMA or Ginnie Mae)[6] standby or forward commitment market.

The judicial record (the trial record) includes: Board exhibits and testimony of witnesses called during the Board's initial case; exhibits of Washington Federal; and the testimonies of Charles Glueck, the chairman of the board of directors and chief executive officer of the Association, and Robert C. Sterbank, the chief financial officer of the Association. In addition to attempting to show Washington Federal's true financial condition, the plaintiff offered testimony to challenge the credibility of statements made by Board staff members at the meetings of the Board. The Board then called witnesses to rebut plaintiff's witnesses.

The court has received into the judicial record evidence to explain the administrative record, *e. g.,* evidence which to this court is "highly technical," *Asarco, supra,* at 1160. More specific examples are the testi-

---

**4.** As seen, defendants' counsel indicate agreement with plaintiff's counsel that it is for the court to "say what the relevant factors are." *PPG Industries, Inc. v. Costle,* 630 F.2d 462, 466 (6th Cir. 1980), endorsing *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1160 (9th Cir. 1980), holds that the reviewing court is "not required to 'take the agency's word that it considered all relevant matters.' "

**5.** *See, Asarco, Inc. v. U.S. Environmental Protection Agency,* 616 F.2d 1153, 1160 (9th Cir. 1980).

**6.** Government National Mortgage Association was created in 1968 to facilitate a flow of funds to the housing market by enabling savings and loan associations with surplus funds in one area to buy loans from savings and loan associ- ations having excess mortgage demands in another area.

GNMA is a corporation wholly owned by the United States Government. It purchases and sells mortgages insured or guaranteed by the Federal Housing Administration (FHA) and the Veterans Administration (VA). It issues GNMA pass-through certificates (Ginnie Maes). A GNMA pass-through certificate is a certificate representing shares in pools of mortgages which are insured by the FHA or VA. The individual pool consists of single-family home mortgages, each having the same interest rate and same approximate maturity. The payments of principal and interest on the mortgages are passed through GNMA to the holder of the certificate. GNMA guarantees the full and timely payment of principal and interest to the certificate holder.

mony and exhibits related to GNMA forward commitments, conventional mortgages, GNMA certificates or securities, and trading and borrowing practices in the secondary mortgage market.

## II.

## A.

The FHLBB requires periodic examinations of savings and loan associations insured by the FSLIC. *See* 12 C.F.R. § 563.-17–1. Washington Federal was examined as of May 30, 1978; the report was filed with the Board Supervisory Agent in Cincinnati, Ohio on September 15, 1978.[7] The Report Summary first states:

The association is very active in the secondary mortgage market of GNMA mortgage securities. Its procedures, in part, include the giving of standby commitments to others for a fee and the receiving of standby commitments from others for a fee.[8]

The summary concluded:

To date, the results of these activities have substantially enhanced the association's operations and its net worth position.

In March 1971 when Board chairman Glueck

assumed the day-to-day management of the association, . . . the philosophy of the

7. Charles Glueck was one of the founders of Washington Federal, federally chartered in 1956 as a mutual savings and loan association. In 1977 Washington Federal ranked first among the 1,000 largest associations nationally in terms of return on average assets; in 1978 it ranked third, and in 1979 it was approximately 160th. In the Cleveland area during the past decade, Washington Federal ranked first in growth of savings, exclusive of acquisitions.

8. When Washington Federal, for a fee (usually two percent of agreed price), "sold" a standby contract to another party, Washington Federal was committed to stand by to purchase a GNMA security of a particular coupon at the agreed upon price at the option of the other party at a specified future date. On that date the other party could exercise its option to deliver the Ginnie Mae or let it pass. In the evidence it is designated a "buy" or a "long" because under the contract the association is obligated to buy the GNMA. "Selling" standby

association's operations was changed to include activities in the secondary mortgage market.

Further, the report disclosed that the Association's secondary market transactions[9] in the years 1971 through 1974 involved the purchase and sale of FHA–VA mortgages.

As a participant in the Ginnie Mae market "approximately since 1975," according to Mr. Glueck, Washington Federal had "outstanding commitments" of $140 million at the beginning of 1976. Chairman Glueck disclosed this figure in a letter to supervisory agent Duffus, dated June 2, 1976. Mr. Glueck also made projections of the commitments declining to $85 million in 1980. Referring to these projections, he remarked:

This program, as exhibit C shows, will allow us to peak this year in our secondary market activity and in the next four years reduce it dramatically, while allowing us to reach the reserve position required prior to our 25th year.

The "dramatic reduction" in the Association's secondary market activity did not occur. As reported in the 1978 examination report, as of May 31, 1978 GNMA buys totaled $694.5 million while GNMA sells totaled $391.5 million. The net was $303 million.

commitment contracts is also called "selling" or "writing" GNMA forward commitment contracts. Standby commitments obtained from another party for a fee paid by Washington Federal, usually .5 percent, permitted Washington Federal, at its option, to put to the other party a GNMA security of a particular coupon at the agreed upon price. These contracts are referred to in the evidence as "sells" or "shorts."

9. The primary market is the origination of mortgage loans on primarily single-family residences in the local lending area. As defined by Mr. Glueck, the secondary market is a lending activity that has the ability "to send the money where the demand is." The secondary market has been technically defined as "[t]he market in which previously issued securities are traded." Marcia Stigum, *Money Market Calculations: Yields, Break-Evens, and Arbitrage* 191 (1981).

The 1978 report reveals that from August 1977 through July 1978 the Association received standby commitment fees (2.0 percent) less commitment fees (0.5 percent) paid to others to standby netting the Association at $8,485,340. Fee income is reported as part of "Loan Fees" in the Association's semi-annual financial reports to the Board. For the semi-annual period ending 12/31/78, loan fees were $2,096,233; for the semi-annual period ending 6/30/79, loan fees were $1,341,556; and for the semi-annual period ending 12/31/79, loan fees were $921,270. The Association's reported actual "Net Fee, Income Secondary Market" to have been $7,009,000 for calendar year 1978 and $2,071,000 for calendar year 1979. After June 1, 1979 when the Forward Commitment Regulation, 12 C.F.R. § 563.17–3, was put into effect, the Association received no fee income.[10]

In a section of the 1978 report, "Management's Philosophy," written by Board chairman Glueck, he stated:

> As a general rule, we commit ourselves to standbys two years in advance and hedge and overhedge within a year of the time we can be called on to fund standbys. In addition to that positioning, we deal in the cash market.[11]

Noting that the Association's top four officers "devote in excess of 50 percent of their time to the secondary market operations" and that others are "tracking and reflecting the position of our secondary market operations on a minute-to-minute basis,"[12] he added:

> Since "ours" is a philosophy of position, not one of anticipating markets, we constantly are updating our position, setting levels at which we profit buying and selling.

After stating "hedges can be acquired at almost any reasonable level as long as you are willing to pay the appropriate fee," he concluded:

> [T]he greatest fear in a forward commitment program is that interest rates will rise above the commitment level, therefore exposing the committor to excessive losses. We eliminate this possibility by (1) budgeting losses of a reasonable nature to maintain position, (2) hedging every commitment to buy, limiting to reasonable amount the differential between our forward commitment and what someone else must pay us in the hedge, and (3) budgeting and committing funds in the way of fees to overhedge our position creating the opportunity to be very active in the fluctuating cash market without

He further explained the meaning of the term "overhedging":

> What we called "overhedging" was, to take the example I have just described, where we had a commitment and a position in the opposite side, one on one, so a commitment and a hedge, and we would now in that part, where someone else was standing by to us, take more standbys than we were committed to accept; so that if we were committed to accept one, we had paid a fee, and possibly had on the other side commitments for people to stand by for something in excess of one that we were covering, and anything in excess of our obligation to stand by was an overhedge, optional on our part.

---

**10.** For a discussion of this regulation, see p. 357, *infra*.

**11.** At trial, he explained what is meant by "positioning." He testified:

> Then we would take a position within a year of when we were obliged to perform on our commitment in the opposite direction, a hedge against our standby, or have someone stand by to us where we pay the fee.
>
> \* \* \* \* \* \*
>
> At that point in time we now have ourselves in this example obliged to stand by for January 1983, because that was made two years prior, and we have someone obliged to stand by us January 1983, one year prior.

He completed his answer by saying:

> Now, that wasn't an ironclad "must do" in January 1982.
>
> Once step one was done, we knew exactly what the exposure was, and we tried to buffer by at least a year, but that could vary from 9 to 15 months, or whenever a good opportunity to do it would come to pass, but generally it was in that one two-year time frame.

**12.** Mr. Glueck and Mr. Sterbank's thorough grasp of securities trading operations, Mr. Glueck's knowledge and use of Financial Publishing Company's "GNMA Yield and Price Equivalent Table," and their keen facility with mathematics were repeatedly exhibited in their appearances as trial witnesses.

any possibility whatsoever of a loss in the cash market.

The examiner attached schedules to the report to demonstrate the Association's methodology in the secondary mortgage market operation. These schedules were explained by Mr. Glueck at trial; and he demonstrated actual hedging, overhedging and cash market transactions.

Forwarding the examination report to the Association on September 27, 1978, supervisory agent Duffus recommended:

> The Association's report as of August 31, 1978, shows a reduction in the volume of net commitments to buy. We recommend that you continue to cut back on the secondary market operation, but at a faster rate, in view of the possibility of the adoption of a regulation which would substantially curtail the Association's authority to make commitments to buy. You will of course, be notified promptly if any such limit is adopted.

As predicted by agent Duffus, the FHLBB on November 28, 1978 published a proposed rule "regarding forward commitments to purchase securities." The summary of the rule stated in part that the Board proposed to regulate forward commitments by FSLIC-insured institutions, that "Regulatory action [was] needed because some institutions [were] incurring losses by engaging in forward commitments in a speculative manner" and that the new regulation "would limit the dollar amount of outstanding forward commitments."

Washington Federal submitted to the Board a ten-page letter of comments on the proposed forward commitments rule. Noting that "[w]hile most of the proposed provisions are certainly appropriate," the Association stated that "some of the accounting provisions are inappropriate, and would have a detrimental effect upon housing and home financing, and upon the operations of prudent and knowledgeable insured institutions."

As a representative of the United States Savings and Loan League, Mr. Glueck met with the FHLB Board staff members in Washington in early January 1979. He repeated in greater detail the Association's views set forth in the letter.

12 C.F.R. § 563.17–3, effective June 1, 1979, is a revision of the proposed regulation of November 22, 1978. The general limitation in subparagraph (c)(1) states in part:

> An insured institution may make forward commitments to purchase securities, subject to the limits in paragraph (c)(2) of this section, if that activity is conducted in a safe and sound manner. An example of an unsafe and unsound practice which may preclude further investment under this section is an inability to fund commitments when due.

Section 563.17–3(c)(2), "Percent of Assets," limits an institution's outstanding forward commitments to purchase securities to "ten percent of its assets if net worth is less than five percent of assets, or 15 percent of assets if net worth is five percent or more of assets."

In its general comments accompanying the regulation, the Board, in effect, added a grandfather clause. It stated

> that institutions which have exceeded those percentages at the time these regulations become final shall be precluded from further activity in this area until such time as they are within the limits set by subparagraph (c)(2).

As of June 1, under the regulation, the Association was limited to $29.9 million in outstanding forward commitments (fifteen percent of its 5/31/79 assets of $199 million). Its $727 million in forward commitments on June 1, therefore, exceeded the limitation by $697 million.[13] Washington Federal was "grandfathered" as to this excess. The regulation did not limit the buy-

---

**13.** When he met with the staff of the Bank Board in early January, chairman Glueck had appealed to the Bank Board to incorporate into the regulation "some netting effect so as to encourage hedging." This was not done.

Washington Federal's net position on May 31, 1979 was $530 million in GNMA forward commitments. This would have exceeded the $29.9 million limit by $500 million.

ing of forward commitments from others to stand by the Association ("sells" or "hedges").

On July 6, 1979 Mr. Glueck and Mr. Sterbank met at the Home Loan Bank in Cincinnati with supervisory agent Duffus and Dwight Arnall, regional director of the OES whose district at that time included the Cincinnati bank. At the meeting, Mr. Glueck presented a plan which projected compliance with the forward commitment regulation within five years. Washington Federal asked for a waiver of the forward commitment regulation during this five-year period. At the end of the meeting, Mr. Arnall expressed his opposition to the waiver request but promised to take it up with his superiors in Washington.

A week after the July 6 meeting, Mr. Glueck received a telephone call from supervisory agent Duffus asking him to submit a written waiver request. The Association submitted its waiver request to the supervisory agent on September 7, 1979. The request read:

> In order to bring our operations within the parameters of the regulation without causing undue harm, we need:
>
> (a) Authority to exercise our judgment in exceeding regulatory limits on advances and other borrowed money.
>
> (b) Authority to sell forward commitments and progressively reduce both the gross and net outstanding commitments according to the supporting schedules submitted herewith.

Enclosed were "six (6) sets of pro-forma balance sheets and income statements, each set based on a different set of economic assumptions, and a description of how the tools would be utilized under each 'scenario.'" These projections through 1984 were said to "represent a yardstick by which our actual performance can be measured."

Supervisory agent Duffus on September 25, 1979 recommended that the "Association's request be approved subject to the following limitation, or conditions." These conditions provided for close monitoring of the Association and its plan and the right to rescind approval, to modify conditions or to impose additional conditions. In a final paragraph in support of his recommendation, Mr. Duffus concluded:

> To allow a maximum time frame of perhaps as much as five years in which to work out of its present situation and to bring itself into full regulatory compliance does not seem like too high a price to pay for having a much stronger association than would otherwise be the case.

Ten days after the July 6 meeting of Mr. Arnall and Mr. Glueck, Mr. Arnall wrote a memorandum to the FSLIC Deputy Director in which he requested the assignment of a different examiner to perform the "next regularly scheduled supervisory examination ... programmed for the latter part of this month." He noted that "the Association has asked for supervisory forbearance in complying with the new regulations on forward commitments." He asked that the examiner "rigorously analyze [enclosed] projections and the assumptions upon which they are based and advise us whether they are reasonable." He further asked that the "examiner give us his evaluation of the additional loss exposure to the Association of issuing an additional $565 million of GNMA standby commitments as requested."

Robert J. Klancher was assigned the examination. On August 31, 1979 he submitted an interim report; on October 29, 1979 his full report of examination was filed in the office of the supervisory agent. The five-year projections which Washington Federal attached to the September 7, 1979 waiver request letter were discussed in the interim report and the report of examination, and they were attached to the report of examination.

Noting that "the Association specifically asked that it be allowed to gradually reduce its outstanding commitments rather than being required to comply immediately," the examiner listed two Association reasons:

> One of the principal reasons is to enable the Association to sell standbys which will generate an amount of fee income that will at least offset the fee expense incurred to buy a standby.

Both the interim report and the final report stated that "management considers [it] equally important ... to be able to maintain the good working relationships with brokers which have been established over the years." As a related matter, both reports stated:

> The association is finding it increasingly difficult to hedge its present commitments because the regulation has caused a reduction in the Association's activities in this area which, in turn, has resulted in fewer broker contacts.

The two reports disclosed, as phrased in the final report:

> Under the gradual reduction program the Association proposes to sell standbys to purchase $405 million GNMA securities, and to buy standbys to sell $500 million in GNMA securities over the next five years based on [an indicated schedule].

The report continued:

> In order to demonstrate the need for a temporary exemption from the commitment limitation regulation, the Association has prepared a series of six operating and balance sheet projections covering a span of five years.

The interim report found that "the projections were deemed reasonable." The final report of examination merely stated that "the basic assumptions were reviewed for reasonableness."

Examiner-in-charge Klancher concluded his "comments" in the report of examination with this caveat:

> The projection calculations, however, were based on the assumption that the Association would be permitted to proceed with its proposed secondary market activities in the not-too-distant future. Since no standbys are being sold, it ap-

pears that the final income figure will be considerably short of what was projected.

Later events were to record that the request for waiver of the forward commitment regulation during the five-year period covered by Washington Federal's projections was not formally brought to the Board's attention until March 14, 1980. The Klancher "comments" in the report of examination refers to the request of the Association "to exceed borrowed money limitations," a matter also brought before the Board on March 14. He stated:

> The Association is also requesting that, if circumstances dictate, it be allowed to exceed borrowed money limitations. This would give the Association, during periods of unfavorable market conditions, the latitude to avoid incurring losses by borrowing money to purchase GNMA securities for portfolio rather than funding through a sale in the open market. The Association has already begun to employ this strategy and has substantially increased its GNMA portfolio as shown on p. 11.

B.

Chief financial officer Sterbank testified that Washington Federal entered into several types of borrowing:

> [T]here was some borrowing from the Federal Home Loan Bank, and we borrowed from local commercial banks, and we did reverse repurchase agreements.
>
> I would classify them as regular reverse repurchase agreements.[14]

From the beginning of November until the Association was put into receivership, it engaged in yield maintenance dollar reverse repurchase (repo) agreements rather than in "regular reverse repos".[15]

---

14. He defined a regular reverse repurchase agreement as "an agreement by which Washington Federal sold a Ginnie Mae security with a simultaneous agreement to repurchase that same security at a specified future date and at a specified price." *See also, Stigum, supra*, at 12, 13, 191.

15. In order to borrow short-term funds to meet cash needs, a savings and loan association, or

other business entity, may enter into transactions generally entitled "reverse repurchase agreements." A regular reverse repurchase (repo) agreement is an agreement by which an association sells a Ginnie Mae security with a simultaneous agreement to repurchase that same security at a specified future date and at a specified price. Washington Federal had used regular reverse repos "as an ordinary tool of cash management," Mr. Sterbank stated.

A letter from the Association's private accountants, Peat, Marwick, Mitchell & Company, dated October 26, 1979, relates to yield maintenance transactions. The letter was received in evidence not for the truth of its content but as an event that preceded the Association's use of this type of dollar reverse repo.[16] Mr. Glueck testified that he followed "the accounting treatment of which [he] had received advice from Peat, Marwick, & Mitchell."

Attached to a report letter to supervisory agent Duffus, dated December 20, 1979, was a summary of "November and December Dollar Repurchase Transactions" (yield maintenance variety). These resulted in borrowings of $69,194,145.17 in November and $54,433,584.20 in December, or a total of $123,627,729.37. The November 30, 1979 monthly report showed an addition of $60,234,779 in Ginnie Maes to the Association's portfolio. The monthly report for December 31, 1979 showed additional GNMA's in the Association's asset portfolio of $64,103,005.

The letter of December 20 provided projections for the year 1980 based on cost levels using yield maintenance provisions as explained. The "estimate of the worst possible scenario for 1980 based on the present facts" projected net worth decreasing from $12,750,000 in 1979 to $8,263,000 in 1980. The letter noted that "market conditions made the last six months the worst time for Washington Federal to withdraw from its secondary market operations;" that its position had eroded; and that the "results of the erosion [would] not be very apparent until 1980." The Association then expressed the hope "that the Federal Home Loan Bank [would] see fit to give [them] the variances [they] have requested, that, in [their] opinion are so necessary for an orderly winding down of these operations."

In a fixed coupon dollar reverse repurchase agreement, Mr. Sterbank explained:

[T]he security that you are agreeing to repurchase will bear the same coupon face rate as that of the security that you sold, but it may vary in amount that you will receive back, and it may vary as to maturity date.

He then explained,

"The yield maintenance type of dollar reverse repurchase agreement has the added feature that you are agreeing—that the security that you will receive on your repurchase may bear a different face interest rate."

16. The letter reads:

As you requested at our meeting of October 23, 1979, we are setting forth herein our position as to the proper accounting treatment for transactions known as dollar reverse repurchase (repo) agreements.

A dollar reverse repo is an agreement whereby a savings association sells securities with an agreement to repurchase securities of the same agency as the securities sold, at a specified time and price. The security repurchased may or may not carry the same coupon rate as the security sold, depending upon how the transaction is structured. In the event that a different coupon rate security is repurchased, the price is adjusted to provide the association with the same yield it originally had.

Two alternative accounting treatments are in use by various savings associations. One alternative is to regard the sale and subsequent purchase as two independent transactions. Thus, at the time of sale, any difference between the association's carrying value for the security and the sale price would be recorded as profit or loss. The other alternative views the agreement as one transaction in substance, namely a financing transaction. The association has merely borrowed funds, collateralized by the "sold" security.

It is our opinion that whether a transaction is structured such that the repurchased security must carry the same coupon rate as the security sold, or whether it allows for a different coupon rate with the same yield, is not relevant to the accounting treatment to be employed. In either instance, the association has had the use of funds for a period of time, after which it remains with substantially the identical security it originally had. Accordingly, the transaction should be accounted for as a secured borrowing, with no profit or loss recognized upon the "sale."

As you are aware, there is currently an Issues Paper prepared by The Committee on Savings and Loan Associations of the AICPA, which addresses this topic. Its conclusions differ from ours in that a transaction that allows for a different coupon rate would be treated as a separate sale and purchase. In the event and at the time that the Issues Paper is formally promulgated, it will become part of generally accepted accounting principles with whose provisions we will have to comply. We will keep you informed of any developments relative to the status of that paper.

If you have any questions or wish to discuss the matter further, please give me a call.

On January 18, 1980, supervisory agent Lawrence B. Muldoon wrote chairman Glueck concerning a meeting held at the Federal Home Loan Bank in Cincinnati on January 14. Present from the Association were Mr. Glueck, Mr. Sterbank and Mr. Lemley; present from the Bank were Mr. Muldoon, Mr. Duffus, and three other representatives. The letter noted that the Association had been requested to submit "current and up-dated information to support its request for waiver of the forward commitment regulation and other borrowing limitations." Additional specific information comprising five categories and answers to specific questions were requested in the letter.

On February 12, 1980 the Association forwarded to President Thiemann, Federal Home Loan Bank of Cincinnati, "all the data requested by Mr. Muldoon [in his letter of January 18]." [17]

While the letter submitted a 1981 projection as had been requested, the principal data was supplied in response to the five itemized requests contained in Mr. Muldoon's January 18 letter. In response to the first question, a "summary of commitment position—12/31/79" showed a total position of $433,500,000 in outstanding commitments. Also a schedule giving "details of commitment position—12/31/79" was supplied. The commitments were separately identified and described.

In answer to question 2, a schedule was attached entitled "Details of dollar reverse repurchase agreements entered into as of December 31, 1979." The principal balance (face amount) of these repos totaled $152,-427,788.21. Each dealer was identified, and each Ginnie Mae certificate was listed with the amount borrowed (sales proceeds) and other details given with reference to each security. In essence, questions 3 and 4 of Mr. Muldoon's letter of January 18 sought documentation of a typical transaction and "how the Association was able to borrow at the low rates shown in the December 20, 1979 letter." In response, detailed schedules were furnished. Among other things, a "cost of money" schedule indicated that the weighted average [interest] rate of "regular reverse repos" was 13.671 while the weighted average [interest] rate of dollar reverse repos was 10.197.

██ Another schedule supplied, as requested, an example of accounting for GNMA dollar reverse repos. The example reflected a $1 million GNMA transaction with a particular broker. The schedule detailed each accounting step and also recited the specific accounting entries. The court allowed Mr. Glueck to testify at some length in explanation of these accounting steps. [18] It is evident that this schedule and the other schedules attached to Washington Federal's letter of February 12 are detailed responses to the specific questions of the Muldoon letter of January 18, 1980.

In the letter of February 12, 1980 to President Thiemann of the Federal Home Loan Bank of Cincinnati, Mr. Glueck noted:

Because of the time elapsed since the submission of our plan to wind down our secondary market operation and the resulting further exposure incurred together with further deterioration of market

---

17. At trial this submission was labeled "the blue book." The February 12 letter opened with an expression of appreciation for "the time and attention that you, Mr. Muldoon and Mr. Hutchison afforded us on Wednesday, February 6, and your approval of our request for an Advance." The meeting took place in a hotel room in Cleveland. President Thiemann approved an advance of $10 million. At this meeting, Mr. Glueck and Mr. Sterbank were shown and given a copy of R–48, a memorandum issued by the OES on January 29, 1980. The memorandum is discussed, *infra*, at pp. 381, 382.

18. Mr. Glueck contradicted testimony of Board witness John Saalman concerning the accounting treatment of "price differential credit" ["book price of new GNMA" less "cash pay-up at time of repurchase" less "net book value at end of repo"]. The conflicting opinions of Mr. Glueck and Mr. Saalman are not part of the administrative record. In any event, not hearing this case *de novo*, this court may not weigh this conflicting evidence and decide what is appropriate accounting treatment.

conditions, that plan would no longer be effective.

He then went on to say:

Our commitments must be funded, financed and held until such time as market conditions allow us to liquidate them in an economical manner. We are enclosing all the data requested by Mr. Muldoon and cannot emphasize enough that these submissions require our presence and discussion with your staff to promptly reach conclusions that will enable us to avoid what could become a very serious problem.

This request for a meeting led to one in Cincinnati on February 28.

### C.

■ As a result of reassignments of regional directors, on February 11 Edward O'Connell became director of the region which includes Cincinnati (Region 2). Between February 11 and February 27, the date on which he met with OES deputy director Thomas Timmins prior to his departure for the meeting with Washington Federal representatives in Cincinnati, Mr. O'Connell had read the following material about Washington Federal:

—Reports of Examination of May 30, 1978 and July 28, 1979.

—Memorandum of Dwight L. Arnall, Regional Director, January 9, 1980, to Charles G. Myers, Director, Office of Finance, asking him to comment on "the merits of the Association's request" for "a waiver of the regulations limiting forward commitments in the amount of FHLB advances and other borrowed money."

—Attachments to the Arnall memorandum:

Washington Federal letter of September 7, 1979 requesting forward commitment and borrowing waivers and its projections of five-year plan to wind down its forward commitments.

Supervisory agent Duffus's letter of September 25, 1979 recommending the granting of the requests for waivers subject to four conditions.

Washington Federal's letter of December 20, 1979 and projections.

Examiner Klancher's interim report of August 31, 1979 reviewing the projections of the waiver request and deeming them "reasonable" and the computations "accurate."

Portions of the May 30, 1978 report of examination describing Washington Federal's secondary market operations in GNMA forward commitments.

—Charles Myers memorandum to Dwight Arnall of February 8, 1980 (finding "the Association's request to have no merit").

—The Association's February 12, 1980 responses to supervisory agent Muldoon's questions of January 18, 1980.

Plaintiff argues that at the February 27 conference

without any detailed review of Washington Federal's commitment position or how it developed, O'Connell and Timmins decided that the solution for the Washington Federal situation would be a supervisory merger.

This assertion is not supported by the evidence. As seen, the materials that Mr. O'Connell had read, for example the reports of examination, fully disclosed "Washington Federal's commitment position [and] how it developed." It is reasonable to assume that Mr. O'Connell relied on all the materials he had read in reaching a preliminary conclusion that there should be an FSLIC-assisted merger of Washington Federal. As for Mr. Timmins, he remembered "reviewing certain papers that Ed O'Connell brought with him to that meeting that we discussed." When it was suggested that he "didn't discuss with Mr. O'Connell any other possible solutions to Washington Federal on the 27th," Mr. Timmins answered:

Oh, I don't know that we didn't discuss other possibilities.

I think we discussed what could have— for instance, we discussed the possibility of a receivership occurring, but as I recall, what the substance of our comments was, was that it seemed like the best solution to this developing problem would appear to be a supervisory merger.

Mr. Glueck's February 29 letter to President Thiemann indicated that, to their dismay, "the meeting [of February 28] opened with the conclusions expressed by Mr. Muldoon." It appears that Mr. Muldoon proposed an FSLIC-assisted merger. Mr. Glueck continued, "After the statement of position, we were allowed to discuss the submitted material and our analysis of potential cash and collateral needs, but it was apparent that this would be to no avail."

The material submitted at the February 28 meeting included a face sheet entitled, "Assumptions Used in Analysis of Potential Cash/Collateral Needs." Three "assumptions" were listed:

1. Guaranty by F.H.L.B. to dealers covering "net cash required" (combination of letters of credit and additional advances).
2. Dealers continue to roll Dollar Reverse Repos.
3. Dealers accept FHA/VA loans for collateral as projected.

Attached to the face sheet were three sheets, each entitled "Analysis of Potential Cash/Collateral Needs" for each of the years 1980, 1981, and 1982. As explained at trial by Mr. Sterbank, these attempted to review

what amount of cash could conceivably be required under different market scenarios over the period of time illustrating that there was a—certainly an upper limit on the amount that we needed, and that by April 1982 there would be no assistance required.

In the Association's first letter of February 29,[19] Mr. Glueck wrote, "The *only* comfort derived from the meeting was *your* personal assurance that the issue is *not*

closed and that our submissions would get further consideration."

Apparently before he received either February 29 letter, Mr. Muldoon on February 29 wrote regional director O'Connell that consideration had been given "to all of the background data submitted by the subject Association on February 12, 1980 [the blue book], as well as at the meeting on February 28, 1980 with its management staff." Mr. Muldoon made three recommendations: (1) that the FSLIC assume the Association's outstanding forward commitments; (2) that the FHL Bank advance funds (secured by eligible collateral) "to permit the institution to fund additional margin calls and/or commitments due;" and (3) that thereupon "a merger of Washington Federal be accomplished on an assistance basis."

Back in Washington on February 29, Mr. O'Connell prepared his memorandum to file.[20] Some factual statements and some opinions contained in the O'Connell February 29 memo of the February 28 meeting became part of or were the source of language in OES director Taylor's memorandum of February 29, 1980, which he immediately circulated to each member of the Bank Board. These O'Connell statements and opinions will be assessed for factual support since the Taylor memorandum has been made a part of the administrative record. However, because this court is not hearing this case *de novo*, the court concludes that its function is limited to determining whether the O'Connell statement or opinion and the corresponding language in the Taylor memorandum is rationally based on fact found in the judicial record.[21] The memorandum states:

with Charles Glueck, president of the Association, and two of his principal assistants, it is our conclusion that this Association needs an immediate FSLIC assisted merger.

**19.** Mr. Sterbank explained at trial that Dr. Thiemann asked for a letter indicating the credit that Washington Federal was seeking. This is identified herein as the second letter of February 29.

**20.** The memorandum commenced:
At the Office of the Supervisory Agent, on February 28, 1980, financial analyst Ralph Kelley and I reviewed this Association's financial condition with the supervisory agents of the FHL Bank of Cincinnati. As a result of this discussion and a three-hour discussion

**21.** On the afternoon of February 28, Messrs. Taylor and Timmins attended the "problem book" meeting. While Washington Federal was listed in the problem book as Category II (Category I is more severe), there was no discussion of Washington Federal at the meeting. Later that day, chairman Janis of the Bank Board called Mr. Taylor from the Federal Re-

The Association's problems relate to its speculation in the Ginnie Mae market. Forward commitments to purchase are approximately $432 million through June 1981. Based on the information we received, this Association does not have the capacity to fund commitments and meet margin calls. The Association anticipates a $17 million margin call on Monday, March 3, 1980. This, the FHL Bank of Cincinnati says it will fund through a collateralized advance. The objective being a stop-gap measure to keep the Association "alive" until a solution to its problems can be arranged.

Footnote No. 2 is related:

The Association estimates it will need $97 million in cash between now and March 19, 1980. This consists of $17 million for a March 3, 1980 margin call and $82 million in funding requirements at March 19, 1980. The Association states it will need advances of $97 million or a letter of credit plus $11 million. The Association expressed concern that the securities dealers would be unwilling to enter into further reverse repurchase agreements absent a letter of credit from the FHL Bank of Cincinnati.

The funding schedule prepared by Mr. Sterbank on March 6, 1980 and the "Cash Requirements for March 1980 Fundings" (PX 84), see Appendix C,** substantiate the general accuracy of Mr. Connell's statements concerning the Association's esti-

mates of its cash funding needs in March 1980. Thus, the O'Connell statements reflect the upcoming financial condition in March.

Plaintiff argues:

O'Connell's assertion of "speculation" by Washington Federal in the Ginnie Mae market was based only on his meeting with Washington Federal and not on any interviews or in-depth review of Washington Federal's secondary market operations.

Plaintiff's argument ignores the record. Prior to February 29, Mr. O'Connell had read the examination reports of May 30, 1978 and July 28, 1979 and their "in-depth" description of Washington Federal's secondary market operations. The same secondary market operations descriptive material was attached to Dwight Arnall's January 9 memorandum. He had read all the attachments. Thus he knew from the 1978 report that it was a part of Washington Federal's "management philosophy" to "commit [itself] to standbys two years in advance and hedge and overhedge within a year of the time [it could] be called on to fund standbys."

From the same report he knew that management recognized with their "experience in [the] secondary market operations," that "the area of risk is confined to the period of time between when we issue a standby commitment and cover it with a hedge." He knew that it was management's further

---

serve. While he was there on other business, chairman Volcker of the Federal Reserve Board called Mr. Janis into his office. He said, "Jay, I hear you have a sick Association in Cleveland, Ohio, that is about to go under." Chairman Janis got in touch with director Taylor about what he had learned. Director Taylor looked at the problem book and found that Washington Federal was listed there. He called chairman Janis and gave him all the information that was in the problem book. That night he talked to deputy director Timmins.

While the following testimony is not part of the administrative record, it is cited to provide continuity. Asked what kind of trouble Washington Federal was in and why it had not been discussed at the problem book meeting that afternoon, Mr. Timmins

explained what the situation was to the best of [his] knowledge; that the reason that it

had not been discussed at the problem book meeting was that Mr. O'Connell was meeting that day with the Association people and [their] people in the bank, and [he] wanted to hold off until [he] had the very latest information, and [he] was awaiting [O'Connell's] return the next day.

Mr. Timmins called Mr. O'Connell on the evening of February 28 after he returned from Cincinnati. Mr. Timmins, who largely prepared the Taylor memorandum of the 29th, met several times with Mr. O'Connell on the 29th and on that day received from him a copy of his February 29 memorandum. Although he did not review the examination reports until the following week, Mr. O'Connell, with whom he consulted, had reviewed those reports.

** [Omitted for purposes of publication.]

opinion that "[s]ince part of the discipline is to not let these standbys get closer than one year to call before they are hedged, the cash flow risk is non-existent." Contrary to this opinion, James Connolly [22] opined, in effect, that it was speculative not to hedge simultaneously, but instead to hedge and overhedge a year after contracting for a standby forward commitment.

Cross-examined by plaintiff's counsel, Mr. Connolly testified:

Q. Mr. Connolly, do you understand what Washington Federal meant when they used the word "hedge"?

A. They could have called—and, I believe, according to Mr. Glueck's testimony, you can call it anything you want, but it was not a hedge.

Q. Mr. Connolly, we have to call it something. What do you want to call it?

A. I'll call it a separate speculative transaction.

Q. I'm not going to call it that.

A. Okay.

This further exchange occurred:

Q. Do you know any month, Mr. Connolly, in 1978 when the same result which you just described on page 25 was not true, that is, that every standby commitment was covered with a hedge?

A. I know of no month; but if I can quantify that again by saying that you can enter into any transaction and you cannot wait one year and call it a hedge.[23]

Washington Federal did not offer any evidence to show that its "investment strategy" was not speculative. The closest its evidence came was Mr. Glueck's testimony, "That was not the procedure we used," when he was asked whether the Washington Federal Board specified that "there had to be hedges entered into on or about the time the standby commitments were

contracted for." He was more frank when, on November 25, 1977, he wrote:

We have developed our secondary market business to the extent where we do not have a problem executing the above plan and find it very *uneconomical* to hedge more than twelve to fifteen months in advance. [Emphasis added.]

Based on the administrative record as explained in the judicial record, Mr. O'Connell's characterization of Washington Federal's "speculation in the Ginnie Mae market" is rationally based on fact. Also there is a rational basis for the Taylor memorandum to refer to the GNMA speculation as "massive," noting as it did that the Association had assets of $383 million and $432 million in forward commitments.

In sum, the foregoing O'Connell memorandum statements accurately and fairly picture Washington Federal's March financial prospects, with March 19 the climax date. Combining this memorandum, the Taylor memorandum attachments, "Statement of Condition, December 31, 1979" and "Summary of Commitment Position—12/31/79," the following statements in the Taylor memorandum are rationally based on fact:

Washington Federal, a $383 million Association, operates five offices in the Cleveland, Ohio area. Its present problems result from a massive speculation in Ginnie Maes. The Association has commitments to purchase Ginnie Mae securities through June, 1981, of $432 million. The Association has neither the capacity to fund these commitments nor the net worth to absorb the losses estimated at $61 million which would result from the sale of such securities.

\* \* \* \* \* \*

22. Mr. Connolly is national sales manager of the mortgage securities department of Salomon Brothers, an investment banking house based in New York City.

23. "Hedging" is defined as "reduc[ing] risk (1) by taking a position in futures equal and opposite to an existing or anticipated cash position, or (2) by shortening a security similar to one in

which a long position has been established." *Stigum, supra,* at 186. As used in the commodities futures market, hedging contemplates that the hedging contract or sale is "at the same time" as the purchase. See "Hedging," *McGraw-Hill Dictionary of Modern Economics* 271 (2nd edition 1973).

In this connection, an additional $17 million in margin comes due on March 3, which the FHL Bank of Cincinnati will fund. An additional $82 million comes due on March 19, which the Cincinnati Bank will fund if we subordinate the FSLIC as we did in Hawaii.

Mr. O'Connell's memorandum further observed that "despite the Association's admission that it needs assistance to honor its obligations, it is opposed to a merger." He then stated:

The Association's story is that it knows more about its securities transactions than anyone else and it should be given the opportunity to try to work out of its problems. This it believes can be achieved by the FHL Bank of Cincinnati providing advances as needed and also providing a letter of credit which will act to comfort securities dealers who are becoming very anxious regarding the Association. The line of credit requested is $566 million.

After reporting that the Association "was encouraged to state its workout plan and submit its requests for our review," he stated:

The only thing offered by the Association was for us to close our eyes to the situation and let the Association do what it can to work out of its situation. The Association did state it would request a letter of credit and free access to the advance window.

Plaintiff characterizes O'Connell's description of the Washington Federal plan as "grossly inaccurate and irresponsible." Mr. O'Connell was asked on cross-examination if he heard the statement "a line of credit was requested in the amount $566 million." He answered "Yes." When asked who said it, he stated, "I believe it was Mr. Sterbank. It was not Mr. Glueck. I believe it was Mr. Sterbank." Both Mr. Sterbank and Mr. Glueck deny that such a statement was made. The first page of the plan presented at the February 28 meeting mentioned "letters of credit" but mentioned no amount, as seen earlier. Washington Federal's second letter of February 29, 1980 thus described

its request: "As a follow-up to our discussion of February 28th, we are requesting that the Federal Home Loan Bank issue letters of credit or a guaranty in some form collateralizing the mark to market on our outstanding position with GNMA dealers." The letter went on to say:

In addition to the letters of credit, we also require additional advances in the amount of $11 million, assuming our ability to execute dollar reverse repurchase agreements at market levels in effect at the time of our meeting.

Just as the letter spoke of letters of credit in the plural and $11 million, Mr. O'Connell's footnote to his memorandum stated, "The Association states it will need advances of $97 million or a letter of credit [obviously different than the $566 million letter of credit], plus $11 million."

Washington Federal's "letter of credit or guaranty" request specified no amount on the letter of credit. However, Washington Federal's "outstanding position with certain GNMA dealers" included its dollar reverse repos as well as its standby commitments. Clearly, Mr. Muldoon believed the letter of credit or guarantee request applied to the Association's entire position. On March 10, 1980 he wrote Mr. Glueck:

On Monday afternoon, March 4, 1980, I advised Mr. Sterbank that a letter dated March 4, 1980 was forthcoming from the Bank indicating that the Bank would not issue a letter of credit or guaranty to Washington Federal regarding all outstanding commitments, as requested by your February 29, 1980 letter.

The total outstanding commitment position was in the $500 to $600 million range. Thus Mr. Muldoon's letter offered circumstantial corroboration that Washington Federal requested a $566 million letter of credit, as the O'Connell memorandum stated. The court finds the memorandum statement to be rationally supported.

Slightly altered, the O'Connell statement became the Taylor memorandum sentence, "The Association requested a letter of credit of $566 million plus advances as needed." The rationality of the O'Connell statement

applies equally to this Taylor memorandum statement.

The "plus advances as needed" phrase is rationally based on the Association's request for a $10 million advance in February through December 1980. However, the plan made clear that based on December 31, 1979 levels, $10 million was the maximum advance specified in the 1980 projection and no additional FHLB advance was included for 1981 and 1982. Thus, it is hyperbole, not rationally based in fact, for O'Connell to state, and for the Taylor memorandum to adopt, that the Association wanted "free access to the credit window of the FHL Bank of Cincinnati." [24]

The Taylor memorandum of February 29 reported to each Board member the outcome of the Cincinnati meeting of the previous day. In addition to the account of the meeting set forth in the Taylor memorandum, each Board member was provided with attachments, one of which was the Muldoon letter of February 29, 1980. [25] Thus the Board members knew that the supervisory agents reported that they had given consideration "to all of the background data submitted by the subject Association on February 12, 1980, as well as at the meeting on February 28, 1980 with its management staff." By submitting to the Board members the letter that reported that "background data" had been "submitted," it is evident that neither Mr. Timmins, Mr. Taylor, nor Mr. O'Connell was acting to screen from the Board the plans submitted by Washington Federal. Each Board member was then able, if he chose, to

obtain and study those materials. The factual statements of the Taylor memorandum based on the O'Connell memorandum and the attached Association's "statement of condition" as of December 31, 1979 are determined to be rationally based on facts contained in the judicial record. The one exception is the exaggerated statement that the Association wanted "free access to the credit window of the FHL Bank of Cincinnati."

The Taylor memorandum proposed alternatives and made a staff recommendation. Providing a timeframe, the memorandum stated, "It would appear that March 19 is our target for either merging or putting a receiver in the Association." Since March 19 was the date on which $52 million in dollar reverse repos and $10 million in standby commitments needed to be funded to prevent default on those obligations,[26] it was rational to suggest March 19 as a date "for either merging or putting a receiver in the Association."

## D.

Referring to the "three-hour discussion ... with the Association's representatives," the Taylor memorandum stated:

> While the Association's representatives said they would cooperate, they stated that they were opposed to merger. What they want is permission to ignore regulations and accounting rules and at the same time have free access to the credit window of the FHL Bank of Cincinnati.

24. The plaintiff also takes issue with O'Connell's statement

the Association's story is that it knows more about its securities transactions than anyone else and it should be given the opportunity to try to work out of its problems.

Choice of the word "story" shows O'Connell's disbelief that this was so. That plaintiff's representatives uttered such statements is supported by Mr. Glueck's similar language in his letter of February 29. The letter concludes:

We still feel that with your support *we are best qualified to handle the situation in a manner that will be most beneficial to all concerned.* We believe that after a careful review of the situation, you will conclude as

we have that involving and exposing the FSLIC at this time is unnecessary. [Emphasis added.]

25. On p. 2 the Taylor memorandum stated, "[S]ee attached letter." The context makes it clear that the "attached letter" is the Muldoon letter of February 29.

26. The judicial record rationally supports O'Connell's statements in his memorandum:

The immediate problem, however, is insolvency in the bankruptcy sense. The Association's liquidity and sources of borrowings are simply inadequate to cover funding requirements.

A reference to "accounting rules" obviously relates to the OES memorandum, R–48, issued January 29, 1980, differentiating the accounting treatment of fixed coupon dollar reverse repos and yield maintenance dollar reverse repos. See n.14, *supra*. This memorandum is discussed in connection with the Board meeting of March 14, 1980, *infra*, at pp. 381, 382.

The statement that Washington Federal wanted "permission to ignore regulations" refers to Washington Federal's written request of September 7, 1979. This letter sought waivers of two regulations. One is the forward commitment regulation and its fifteen percent of assets limitation. The waiver sought permission to sell forward commitments, "progressively reduc[ing] both the gross and net outstanding commitments." The other is the borrowing regulation.[27] The Association sought authority to exceed "regulatory limits on advances and on other borrowed money."

> Plaintiff points out:
> Timmins [the preparer of the Taylor memorandum] did not describe what "regulations" were at issue in Washington Federal's request. He did not explain that Washington Federal had, in September, 1979, asked for permission to exceed the forward commitment regulation to wind down its secondary market operations.

In September 1979, regional director Arnall received the Association's request for waivers of these regulations and supervisory agent Duffus' recommendation that the request be granted subject to certain conditions. Duffus continued his recommendation in the report of examination filed October 29, 1979. Yet, regional director Arnall took no recorded action on the request until January 9, 1930. On that day he submitted a letter request to Charles G. Myers, director, Office of Finance, for "comments . . . on the merits of the Association's request." The letter had the voluminous attachments identified, *supra*, at p. 362.

Another month passed. Mr. Myers on February 8, 1980 submitted his two-page memorandum to Mr. Arnall in which he found the "Association's request to have no merit for several reasons."

Initiated by a request from OES Director Taylor, a memorandum was submitted by Mr. Arnall to Mr. Timmins on March 10, 1980. In the memorandum, Mr. Arnall listed "various reasons why [he] did not process the Association's request to the Bank Board immediately." He said, "[T]here was insufficient information for me to evaluate the Association's projections." Although the examiners "concluded [in the interim report of August 31, 1979] that the projections were reasonable and that the computations were accurate," he said that he "did not find the examiners' conclusions to be too reassuring in light of their consistent disregard of the seriousness of the Association's situation." While he said he asked for the workpapers and backup material to be sent to Washington for his own personal review of the reasonableness of the projections, "this data was never received."

His second reason was that "the Association's projections quickly became obsolete" because increasing interest rates, following submission of the request, caused the market for GNMA standbys to deteriorate further. He said that while "the Association's projections were always suspect," they became "even more so in light of the increased rates." As the third reason, Mr. Arnall stated:

> I did not believe that there was any great urgency in submitting the Association's request to the Bank Board. I believe that the requests were without merit. There was no provision in the regulations for an application for waiver. It was

---

27. 12 C.F.R. § 563.8 imposed a 50 percent of deposit limitation on an Association's borrowings of which 40 percent applied to FHL Bank borrowings and ten percent applied to outside borrowings. As of February 29, 1980, Washington Federal was restricted to $90 million in borrowings (50 percent of its total deposits of $180 million), only 20 percent of which ($18 million) could come from sources other than the FHL Bank of Cincinnati. Their total borrowings, however, were $231 million. Thus the borrowings exceeded the regulation's limit on total borrowings by $141 dollars, and all of the excess were outside borrowings.

inconceivable to me that the bank Board would permit the Association to violate its recently adopted regulations. It seemed to me that we should not present the request to the Bank Board until we had a better understanding of the Association's financial condition; had considered all of the possible alternatives; and decided upon the best course of action.

■ While it was "inconceivable" to Mr. Arnall that "the Bank Board would permit the Association to violate its recently-adopted regulations," this was a decision for the Board to make, not Mr. Arnall. The "urgency" was manifest even though not perceived by Mr. Arnall. Mr. Arnall should have submitted the waiver request to the Board soon after the report of examination was filed on October 26, 1979. The only reasonable ground for further delay would have been to await Mr. Myers' opinion, had it promptly been requested. None of the subreasons which make up his third reason

excuse his continuing procrastination in handling the Association's request for waivers.[28] In effect, he arrogated to himself the right to decide how the Board would rule on the Association's waiver request. This was arbitrary.

■ But the matter does not end there. Plaintiff submits no evidence that expressly shows, or from which it may be inferred, that the absence of Board action on the request for waivers until the meeting of March 14, 1980 contributed to the true financial condition which Washington Federal faced in March.[29] In the absence of such evidence, Mr. Arnall's arbitrariness becomes an immaterial factor in terms of the final result.[30]

Plaintiff contends that the Myers memorandum, attached to the Taylor memorandum, is "replete with misstatements about Washington Federal's situation." Analysis of plaintiff's objections convinces the court that the overall factual underpinning of his opinions does not misstate "Washington

**28.** In his memorandum of March 10, Mr. Arnall reported to his superiors

At a meeting in Washington on January 9, 1980, supervisory agent Muldoon advised me that the recommendation previously made by supervisory agent Duffus no longer represented the position of his office and that the Association's requests should be placed on "hold" pending further consideration by his office.

Mr. Muldoon in a January 18 letter to Mr. Glueck sought "current and up-dated information to support [the Association's] request for waiver of the forward commitment regulation and other borrowing limitations." This was at the behest of Mr. Arnall, according to Mr. Muldoon's January 23 memorandum to file. Having received Mr. Myers' memorandum on February 8, Mr. Arnall had no reason to further postpone submission of the Association's waiver request to the Board (through his superiors). But he still did not act.

**29.** While Mr. Glueck was under direct examination the court raised the question of whether testimony would be offered on the effect, if any, of the delay in acting on the plaintiff's waiver requests.

But I do think that it's—it may be that one of the things that I better think about here in terms of this guideline—if we want to call it that—is whether, indeed, if the Board had promptly—and whether it was the Board's fault or somebody else's fault—if the Board had promptly reviewed this request for waiv-

er—at some time I assume somebody's going to testify as to whether it made any difference—the fact that it didn't promptly is quite clear in this record the more I've heard of it, they just didn't promptly review the request for waiver.

Now, did that make any difference had they turned—had they looked at the request that Washington Federal Bank in September of '79 or even earlier—this happened on July 6—had the Board considered this earlier, would this, you see, in some way out of the crisis situation that they faced in March, but in a situation in a little more relaxed environment, if they had looked at it in September of '79, would they have had a different perception of the competence of this management.

**30.** In his memorandum of March 10, Mr. Arnall dealt with the claim of injury to the Association caused by his "failure: "

The contention has been raised that failure to promptly approve the Association's requests has injured the Association. I believe that it is clear beyond any doubt that the opposite is true. Ginny Mae prices have declined substantially since the Association submitted its requests. Had the Association been permitted to issue additional purchase commitments as requested, it would now have sustained additional market losses of millions of dollars.

Federal's situation." Therefore, the opinion, although one with which plaintiff disagrees, is rationally based in fact. Plaintiff's principal objection, Mr. Myers' comments on Washington Federal's use of "overhedging," is discussed in the margin.[31]

Plaintiff notes that Timmins attached the Myers opinion to the Taylor memorandum, but he "did *not* attach the recommendations of the supervisory agent that the waiver request should have been granted." Plaintiff's criticism is well taken. Since Messrs. Taylor and Timmins submitted to each Board member the Myers memorandum, fairness to the Association also called for submission of the Duffus September 25 letter recommending granting of the Association's waiver requests subject to the named conditions. More to the point, OES director Taylor should have furnished each Board member with the Arnall memorandum of March 10 instead of putting it with "materials that [he] was collecting in a Washington Federal file." The Arnall memorandum and its attachments contained everything. It gave Ar-

nall's reasons for not "process[ing] the Association's request to the Bank Board immediately." It attached the Association waiver request of September 7, 1979; supervisory agent Duffus' letter recommending the granting of the waivers; the letter of the Association of December 20 which explained "Results of November and December Dollar Repurchase Transactions;" and the Myers memorandum of February 8, 1980.

Attaching the Myers memorandum to the Taylor memorandum while failing to attach the Duffus letter of recommendation, the Arnall memorandum and its attachments, and the O'Connell memorandum of February 29, all exhibited an assumption, if not a decision, on the part of the staff that Washington Federal would not be able to extricate itself from its March funding needs. The question then is whether this staff attitude renders invalid the Board's later actions on March 14 and 18. It is concluded for several reasons that it does not. First, the earlier ruling that the failure of Mr. Arnall to process the Associa-

---

**31.** Plaintiff says

Myers' total inability to understand Washington Federal's secondary market operations was clearly demonstrated in the last paragraph on page 2 of his memorandum of February 8, 1980 where he refers to "overhedging." Myers described overhedging as separate transactions that are "additional risks" under which Washington Federal hoped for the price of Ginnie Maes to fall further than the cost represented by the hedge.

Cross-examination of Mr. Myers made it clear that he fully understood the meaning and purpose of "overhedging" as practiced by Washington Federal. Thus he testified:

Now, the overhedging is a term that they used—that they describe it as wanting to buy more standbys, not necessarily applied to the original standby, because that already has been hedged, so that they can then enter the market and buy more standbys for a fee, and that is what they called overhedging.

And overhedging says that if the interest rates continue to rise, that at some point in the completion of that contract, that they would be able to buy a security on the cash market cheaper than what they put it to the person standing by and make a profit, or it also covered their operation in the cash market as described in the examiner's report.

So overhedging is really taking on more hedges, buying more hedges beyond that needed to match a particular standby which you have written on the other side.

He further said that "[overhedges] are merely additional risks taken in belief [that] the price of GNMA's might fall further than the cost represented by the hedge and so should be viewed as a separate financial position." The term "additional risks" is broad enough to embrace "market risks." Some reader might have been misled, although no proof of confusion was offered. As he explained at trial, he is not referring to "market risks." Mr. Myers is speaking of the lost cost of buying standby commitments whose options might not be exercised by Washington Federal if "the price of GNMA's" did not "fall further than the cost represented by the hedge." This is in accord with the Association's "strategy." Hedge options were exercised to match standby commitments put to Washington Federal. But an overhedge option was only exercised if a corresponding GNMA could be bought in the cash market below the overhedged price. The Association would then put that cash market security to the overhedge seller at the higher overhedged price.

tion's waiver request has not been shown to have been material to the Association's true financial condition in March 1980 applies equally to the failure to attach the Duffus recommendation to the Taylor memorandum. Second, since the transcripts of the March 14 and 18 meetings do not mention the Myers memorandum, the attachment of the Myers memorandum without the Duffus recommendation has not been shown to have affected the Board decisions of March 14 and 18. Third, the Myers memorandum has a rational basis in fact although Myers' opinions cut against the Association.

### III.

#### A.

A memorandum was jointly issued to chairman Janis on March 6, 1980 by L. David Taylor, director OES, and Samuel D. Ewing, director FSLIC. It was prepared by Gene L. Hall, "Chief of the Problem and Rehabilitation Division, Office of the Federal Savings and Loan Insurance Corporation," and approved by Mr. Taylor's staff (principally Mr. Timmins). This memorandum was distributed soon after March 6 to the other two Board members. Entitled "Recommendations for Policy Considerations," the document was comprised of four parts, "Recommendation," "Financial Data," "Current Information," and "Alternatives Available." [32] Under "Current Information," the memorandum stated in part:

Commitments of $10 million and reverse repos of $52 million come due on March 19, 1980. An additional $18 million of commitments come due throughout the remainder of March. An, as yet, undetermined amount of collateral and margin, which we believe is in excess of the Association's net worth will be forfeited if funding is not provided. The Cincinnati Bank does not wish to make advances for this purpose unless the FSLIC subordinates its position to that of the Bank in the event of liquidation. The Association is opposed to merger and has requested the Bank to (1) make advances as needed and (2) provide a line of credit of $566 million.

Items (1) and (2) in the last quoted sentence duplicate statements in the Taylor memorandum which have been found to be rationally based. Those part II.D. rulings apply here.

Examiners Klancher and Miley worked in the office of Washington Federal during early March in preparing schedules to show Washington Federal's current financial condition.[33] These schedules are supplemented by, and in part based upon, tabulations that were completed by Mr. Sterbank on or about March 11. One tabulation is entitled "Details of Dollar Reverse Repurchase Agreements Entered Into as of February 29, 1980." The other tabulation is entitled "Details of Commitment Position—2/29/80."

From the beginning of March, Washington Federal sought a meeting first with

32. The available alternatives were identified as (1) "Liquidation," (2) "Supervisory Merger," (3) "Rehabilitation," and (4) "Purchase and Assumption" (clean balance sheet). The lead paragraph of the memorandum began, "We recommend a 'clean balance sheet' purchase and assumption transaction to solve the problems of this association." Hall is characterized by the plaintiff as the person who from March 3 to March 14 "orchestrated the eventual purchase and assumption transaction entered into between the FSLIC and Broadview Savings." Hall and other staff members undoubtedly believed that it was likely that some type of a takeover of Washington Federal would occur on March 19. In addition, on March 12 Hall said that he had "discussions with a number of people that if certain things were necessary, we

have to have X number of people and, 'Let's get the contingency plan together'." Rather than organizing a "conspiracy" against Washington Federal, as was suggested during trial, it is rational to conclude that to use Hall's own words, he put together a "contingency plan" in the event of a merger or other takeover of Washington Federal.

33. In numerical order, these are schedule 1, "Pertinent Information on 'Mark to Market' Agreements;" schedule 2, "Summary of Commitment Position as of 2/29/80;" schedule 3, "Collateral Position—Dealers with Mark Agreements;" and, schedule 7, "Assets Pledged." Schedules 5 and 6, prepared by Mr. Sterbank, are mentioned above in the text.

chairman Janis and Board member Dalton and then with chairman Janis alone. Chairman Janis denied the requests. However, Rita Fair, the chairman's executive assistant, set up and "chaired" a meeting of Board staff and Washington Federal representatives on March 13.

It is necessary to determine whether there is a rational basis for staff statements made at the March 14 Board meeting reporting the Association's March 13 requests of the Bank Board or FSLIC. Trial testimony concerning the March 13 requests will be reviewed.

It is undisputed that at the meeting Mr. Sterbank distributed copies of and explained documents entitled "Summary of Commitment Position at 2/29/80" (Px. 58); "Pro Forma Analysis of Cash/Collateral Needs" (Px. 57); and "Cash Requirements for March 1980 Fundings (Px. 84)." [34] These exhibits are attached to Appendix C to assist in understanding references to them in this opinion.

The "Summary of Commitment Position at 2/29/80" recorded a total of $226.5 million in dollar reverse repurchases, including $109.5 million with GNMA collateral, $109 million with GNMA and FHA/VA collateral, and $8 million with no collateral. Standby commitments totaled $380.5 million. The "grand total" of dollar reverse repurchases and standby commitments was $607 million.

Referring to "Cash Requirement for March 1980 Fundings," Mr. Sterbank explained at trial that the purpose of this schedule (Px. 84)

was to show how much money [Washington Federal] actually would need on a temporary basis until [it] got into position doing dollar reverse repurchase agreements in accord with the schedules that [it had] on Exhibits 57 and 58.

Plaintiff's exhibit 84 starts with a total figure of $79,500,000 (the purchase price of GNMA and FHA/VA securities in the face amount of $82 million). Added to this is $20,900,000 (mark to market required at 2/29/80) for a "gross requirement" of $100,400,000. Subtracting adjustments reduce this sum to a "subtotal—$77,700,000." A second sum of $20,900,000 (composed of proceeds of dollar reverse repos anticipated in the latter part of March and another sum of $6.9 million in margin calls that might not be made in March) was subtracted, reducing the projected cash requirements for March to a net of $56,600,000.

It is not in dispute that the "Cash Requirements" sub-total figure of $77,700,000, rounded to $80,000,000, was reported at the March 14 Board meeting as the cash requested by the Association for March. However, the Association's Assumptions, or Plans A, B, and C, comprising the right hand portion of "Pro Forma Analysis of Cash/Collateral Needs" (exhibit 57), and described by Mr. Sterbank at the meeting of March 13, were not physically presented or summarized at the Board meeting of March 14.[35]

At trial Mr. Sterbank testified that he explained the plans to the Bank Board staff at the March 13 meeting as follows:

So all the numbers in that column are predicated on this Assumption A relating

---

**34.** Exhibits 57 and 84 had been prepared by Mr. Sterbank in Cleveland prior to March 13 for presentation to Bank Board members. He had prepared exhibit 58 early in March, a copy of which had been given to examiner Klancher. This became Klancher's Schedule No. 2. Thereafter, in preparation for the meeting, Mr. Sterbank had added a column of figures in the lower right hand corner, the bottom line of which reads, "Cash Required from Other Sources to Meet Mark to Market Requirements, Total—$20,930,089."

**35.** On cross-examination, Mr. Timmins so testified:

Q: Now, Mr. Timmins—and I take it in the briefing session with the Board members and the meeting with the Board, you didn't present these three alternatives on the bottom of page 45–B?
A: They were talked about in the context that had there been sufficient time, a lesser loan would have been required, but due to the lateness of the hour in this request, that it would be impossible to get to the brokers in sufficient time, and what was really being requested was approximately $80 million. That is my recollection.

to the 20 million that in that circumstance the Federal Home Loan Bank would merely advance 20 million 930 thousand to cover that mark-to-market requirement as of February 29.

Plan B was for not an advancement of the fund in the form of cash, but merely in the form of a guarantee or promise to those dealers that were entitled to the coverage that the mark-to-market would be covered at some future time if Washington Federal were unable to meet the obligation out of its own funds.

Plan C, he "pointed out to the Federal Home Bank," was "most advantageous because it ... required cash at the latest possible time" (a maximum of $23 million in January, 1981):

> [I]t would have involved their issuing a guarantee to the dealers that were involved for the entire mark-to-market position as of February 29.
>
> That amount is 84 million 526 thousand plus, and if you recall, that total came forward from Exhibit 58.
>
> I pointed out that if the Federal Home Loan Bank were able to provide that type of guarantee, that in the month of March there would be no cash required from the Federal Home Loan Bank to assist Washington Federal in meeting its commitments.

Thus, Mr. Sterbank, in effect, is saying that the guarantee requested from the Bank Board is "84 million 526 thousand plus."[36] There is a wide disparity between recollections of the Bank Board witnesses as to the amount of guarantee requested and Mr. Glueck's and Mr. Sterbank's recollections of that amount.

Mr. Taylor testified that what Mr. Glueck was asking for involved three components. The first was "a loan from either the FSLIC or the Cincinnati Bank ... $77.7 million as a loan." The second was "a

guarantee for Washington Federal to use with its brokers, indicating that the Bank or the FSLIC would back up its commitments." The third was "to not apply R-48 to the Association," but he added that "at a later point in time, Mr. Glueck indicated that would not be entirely necessary." Asked if Mr. Glueck addressed the question of the dollar amount of "how much would need to be guaranteed," Mr. Taylor answered:

> Yes. It was done in a way that it referred to the full amount in terms of the guarantee, but Mr. Glueck drew attention to the fact that what would be at risk to the Bank Board system would be the market loss on the securities, and I don't remember an exact number. It was on the order that that risk, as he defined it, would be on the order of 100 million.

The "Summary of Commitment Position" discloses that the market loss as of 2/29/80 of the Association's entire commitment position (dollar reverse repurchases and standby commitments) was $107 million (purchase price total of $587,920,316 less market value total of $480,220,001). Thus there is support for Mr. Taylor's position that Mr. Glueck was speaking of a guarantee of the entire commitment position ($588 million purchase price).

At trial, Mr. Timmins testified that he drafted paragraph 4 of a document entitled "Washington Federal Outline of Alternatives." Prepared after the March 13 meeting, it was distributed to the Board members at the March 14 meeting. Under the heading "Loan for WF and guarantee of commitments (Association's proposal)," the first sentence of paragraph (section) 4 reads:

> Loan of $80 million in March and guarantee by FSLIC to brokers to fund all commitments ($510 million).

36. The "mark to market—Entire Position" on Px. 58 records GNMA collateral of $43,453,752 and GNMA and FHA/VA collateral of $41,072,-812, or a total of $84,526,564.

Similarly, Mr. Glueck testified that 84 million 526 was the "maximum amount of guarantees if those plans had been taken that involved

guarantees." Asked what "the maximum amount of cash" would have been, Mr. Glueck answered:

> 44 million 7 some in Assumption A; 23 million 8 roughly in Assumption B; and 23 million 1 in Assumption C.

It is evident that the total of the two sums ($80 million loan and $510 guarantee) is the equivalent of the guarantees testified to by Mr. Taylor. To the same effect, Mr. Hall testified:

Mr. Glueck stated, if my recollection is correct, at the meeting on the 13th, that in order to meet his obligations, he needed 77.7 million dollars in cash during March, and he needed, to make that work successful, a 510 million dollar guarantee from the insurance corporation, and that was a contingent liability against the insurance corporation's fund. In addition, as I said earlier this morning, I believe he also required relief from the R–48 and the borrowed money regulation.

The final Board witness who was queried about the size of the guarantee requested by Mr. Glueck was Mr. Richard Perry, assistant to Board member Dalton. He recalled the following:

He [Mr. Glueck] indicated ... that without guarantees from the FSLIC or the Bank Board in the approximate amount of $607 million, that they would indeed default on the commitments coming due.

In addition to the $607 million approximate guarantee of their outstanding commitments, it was also requested that the Bank Board, through the bank system or otherwise, provide the cash as required to fund other commitments which come due in March, that would have amounted, according to Mr. Glueck, to $77,700,000.

On direct examination, Mr. Glueck was asked:

At Mr. Taylor's or Mr. Perry's interrogation here in court, do you recall him saying that, "We needed $607 million of guarantees and $77 million in cash?"

Mr. Glueck answered, "Yes, I do." He was then asked, "Is that true?" and he answered, "That is false." As seen, when asked, "The maximum amount of guarantees if those plans had been taken that involved guarantees would be what number?", Mr. Glueck answered, "$84,526,000."

Plainly there is a conflict between the testimony of the Bank Board witnesses and Messrs. Glueck and Sterbank on the subject of the size of the requested guarantee. The four Bank Board witnesses testified that the Association sought an FSLIC guarantee, a "contingent guarantee" as Mr. Hall put it, covering the Association's entire commitment, $588 million (purchase price) or $607 million (face amount), i. e., $510 million net in addition to the March loan of $77.7 million. Mr. Glueck insisted that the guarantee requested was the $84,526,000 specified in Px. 58, and Mr. Sterbank said the same thing.

On the face of the Association's three plans, the highest dollar amount of any specified guarantee was the $84,526,524 mark to market guarantee. There would remain uncollateralized the balance of the Association's entire commitment position ($510,000,000 after the March advance of $78,000,000). Yet the need continued to assure the dealers on the street that the outstanding dollar reverse repos and the outstanding standby commitments held by them (purchase price of $588,000,000 as of February 29, 1980) would be funded when any of the commitments came due. Because of this continuing reality, despite the maximum guarantee figure in the plans, an Association request for a commitment guarantee of $510,000,000 (gross of $588,000,000 as testified to by Messrs. Timmins and Hall) is determined to be rationally based in fact. The $607 million guarantee figure of Perry, like Taylor's testimony, speaks more broadly to a guarantee of the entire commitment position.

### B.

The Board met on March 14, 1980 to consider the proposal that Washington Federal presented to the Bank Board staff on March 13. Earlier that day there had been a briefing session between the Board and staff concerning the same subject. While the principal components of the meeting of March 14 will be later examined in greater detail, those components will now be identified, the precise proposal voted on by the Board will be defined, and the relationship of that Board action to the meeting of

March 18 in which receivership was ordered will be introduced preliminarily.

OES director Taylor and deputy director Timmins described the financial condition of Washington Federal and its proposal to meet that condition. Larry M. Berkow and Lawrence Hayes, each associate general counsel of the Federal Home Loan Bank Board, discussed waiver requests of the Association. The forward commitment position of the Association at different dates was reviewed. Bank Board members and staff members engaged in a discussion of the Association proposal and FSLIC exposure if the proposal were approved.

The staff set forth alternatives available if the proposal were not accepted and discussed the immediacy of the situation faced by the Association. Chairman Janis asked for recommendations from the staff and for their reasons; Board members then gave their comments.

As finally voted upon, the Association's proposal was defined by the chairman in these words:

In other words, the so-called loan of $78 million; the guarantee of $588 million [corrected to "a guarantee then of approximately $510 million]; and the forbearance of accounting techniques on reverse repos.

Each board member voted "denied."

The Board action under review pursuant to section 1464(d)(6)(A) is the Bank Board's March 18 order of receivership entered by resolution at the meeting of that date. Viewed separately, the Board's denial of the Association's proposal is deemed not reviewable either under section 1464(d)(6)(A) or under the administrative procedure act (5 U.S.C. § 704). However, the denial on March 14 of the Association's proposal and the proceedings leading to that denial need to be examined for the presence or absence of factors relevant to the grounds upon which the Board's receivership order of March 18 was based.

(1.)

The "special" Bank Board meeting of March 14, 1980 commenced with Board general counsel Miskovsky stating:

There's being presented to the Board now a proposal which has been made by an association. I think the Board may want to come to some decision on this proposal, therefore I think the record ought to be complete and I think a great deal of matters which, Mr. Taylor, I think would be the one to present this to start out, and I think the Board must be sure that the record is fairly complete on which then they can come to a decision.

Mr. Taylor then stated:

This is a case involving Washington Federal of University Heights, Ohio... The association is in a problem situation that actually has been confronting them for some time, but there is also an immediate situation that we need to turn to as well.

The long-term situation that we're discussing here this afternoon is that this association has outstanding commitments of $600 million in forward purchases of Ginny Mae securities. This was a position that actually was set some time ago; commitments as of last June or so were something on the order of $700 million and there have been no new commitments since that point in time.

The short-term problem, the immediate problem that's pressing on this association at this point, is that there are margin calls that are due in March; there are commitment dates to meet; there are reverse repos to fund.

Mr. Taylor then indicated that in the March 13 meeting, the Association "indicated that the only source of meeting these immediate needs [was] the Bank Board System." He then described three related aspects of the Association's proposal,

the first of which was to meet the March requirement, their estimate of that requirement is $78 million. Furthermore, that the Bank Board System guarantee that the Association—would guarantee to back the Association in meeting the $600 million in forward commitments from this point, and that under this flag that they be permitted to wind down their positions by rolling out the commitments

using reverse repos; this would require forebearance [*sic*] from accounting techniques which would force them to account for reverse repos in these transactions as sales and purchases and thereby taking losses.

Shortly thereafter, Mr. Miskovsky injected a question; after responses he stated:

And now I think [the proposal] has to be adequately aired to the Board so that the Board completely understands the association's offer in effect.

Thereupon Mr. Taylor and Mr. Timmins responded:

Mr. Taylor: Ok. I think the first part of their offer in terms of the $78 million; in terms of a commitment to carry the funding for this month—for the remainder of March is clear, perhaps we need to turn to the guarantee and the impact of that guarantee. Tom, can you lead us through your perspective on that?

Mr. Timmins: What the association has requested is a guarantee in effect by the Insurance Corporation that fundings totaling $588 million will be met, and by the FSLIC doing so, the brokers would release to the association some $60 million of collateral which is now held as margin on outstanding commitments, both firm and standby, and that it would also relieve the association henceforth in the funding of the $588 million from posting any additional collateral. This would be unnecessary since the Federal Government in effect would be sort of—FSLIC in effect would be standing behind these fundings. They request approximately $80 million in cash as a loan for the March funding because they do not believe that they can get the collateral released in time to guarantee the March funding. So what they're asking for is $80 million in cash in a loan, and a guarantee which will free up an additional $60 million in collateral which they can then use as collateral for reverse repos to honor all of the outstanding firm and standby commitments.

Plaintiff says that Board members "were *not* told about Washington Federal's three proposals" and that throughout the meeting of March 14 "the Staff referred to Washington Federal's proposals as if they were one plan." Plaintiff refers to "Pro Forma Analysis of Cash/Collateral Needs" (Px. 57), which contains Assumptions A, B, and C, the three so-called workout plans. About ten copies of exhibit 57, "Summary of Commitment Position at 2/29/80" (Px. 58), and "Cash Requirement for March 1980 Funding" (Px. 84) were distributed by Washington Federal at the March 13 meeting. The evidence indicates that the "Cash Requirement" schedule, but not the "Pro Forma" schedule, was received by Board members.

Mr. Timmins helped prepare, and Mr. Taylor circulated to each Board member, the Washington Federal "Outline of Alternatives," the fourth paragraph of which dealt with the "Loan for WF and Guarantee of Commitments (Association's Proposal)." General counsel Miskovsky exhibited a concern with thoroughness when he stated at the Board meeting, "I think [its proposal] has to be adequately aired to the Board so that the Board completely understands the association's offer in effect." The same concern should have led Mr. Taylor and Mr. Timmins to attach to the "Outlines of Alternatives" (distributed to the Board members) copies of the three documents which Washington Federal presented to the staff at the March 13 meeting.

Whether the Board would have approved any one of the three plans (Assumptions A, B, and C), assuming they had had the physical plans before them, probably would have depended upon the willingness of the Board to accept and approve the plans' express assumptions. The first assumption was that Washington Federal could extend "all commitments . . . in the form of Dollar Reverse Repos." In view of its rejection of the Association's request for forbearance from R–48, *see* pp. 380, 381, *infra*, it is predictable that the Board would not have approved the Association's use of yield maintenance dollar reverse repos. Furthermore, board chairman Janis appeared to accept economist Marcis' prediction that "at least

over the near term future the risk is still one that rates will continue rising" and therefore the market price of GNMA's would reciprocally fall. Thus, it is highly unlikely that the Board would have accepted the second assumption of the projection of the three plans that "market prices remain fixed at 2/29/80 levels." Board member Dalton's first reason for not accepting the proposal was that it "depend[ed] on too many variables in the market place."

It seems likely that Board member assistants who attended the March 13 meeting thereafter briefed the Board members about the Association plans. Nevertheless, if Board members were unaware of the three plans, then they were also unaware that the plans called for advances to the Association in addition to the $78 million reported by Messrs. Taylor and Timmins on March 14. The advances peaked at $44.7 million in assumption A, $23.8 million in assumption B, and $23.1 million in assumption C. In turning down a requested advance of $78 million to meet the March funding needs of the Association, the Bank Board thus turned down a request that was smaller than the Association's actual total request for advances.

Associate general counsel Berkow informed the Board members:

Now the association has suggested that there was [*sic*] several applications on file before the Board [in] which they had previously requested waivers of certain of our regulations, particularly regulations that would permit them to have invested additional funds in Ginny Mae certificates, and these—I think the last letter came in sometime in September of 1979 and this has not been ruled on by the staff nor replied to. In addition they have felt that if they had been permitted a waiver of the regulation, they would have improved their condition.

Mr. Berkow then stated:

The staff has reviewed this and felt that in the light of the rising market, that their proposal would not have had that intended effect, and that the waiver of the regulation should not have been permitted.

Mr. Berkow's mention of the staff review was obviously a reference to regional director Arnall and his identical conclusion in his March 10 report. *See* n.30, *supra*. Mr. Berkow made no mention of supervisory agent Duffus' September 25, 1979 recommendation to regional director Arnall that the waiver be granted on stated conditions. However, as this court has determined, the failure to bring the Association's request for waiver (including agent Duffus' recommendation) to the Board at a date earlier than March 14 has not been shown to have contributed to the Association's condition as it existed on March 14. Mr. Berkow next told the Board members:

The association's officers at a meeting yesterday also suggested that they had a lot of experience in handling Ginny Mae securities, and that they were competent, and that they were willing and desirous of working out this problem themselves, and that they wanted the Board to consider that in terms of this particular proposal.

Thus, the Association's September 7, 1979 request for waiver of the forward commitment regulation was taken up at the March 14 Board meeting. At this meeting, the Board did not expressly pass on this waiver request or on the Association's request for a waiver of the outside borrowing regulation, the continuing violation of which was brought to the attention of the Board members by Mr. Hayes. However, the Board's rejection of the Association's proposal as put to the Board by chairman Janis impliedly rejected both waiver requests of the Association.

Later in the meeting, the staff responded to inquiries of Board member DiPrete as to the Association's commitment positions by "dig[ging]" out of its records these totals:

Mr. Timmins: At the end of May, 1978, the Association had a net position of $303 million long; the result of $695 million longs and $392 million in shorts. On July 31, '79 they were long; net long $533 million as a result of a $661 million long and $128 million short. And as of Febru-

ary 29, 1980, they were long $588 million without any shorts against them. They are net $588 million long.

Developing the question of exposure under the Association's proposal, Mr. Janis put this question, "So we could be obligated to meet $588 million worth of commitments?" Mr. Timmins answered:

> Right. Let me give you one further figure. If the market stays the same as it is as of the end of February 29, 1980, funding these commitments, you would get delivered to you securities worth $107.7 million le.s. In other words the securities that would be delivered would only be worth, for the $588 million you would put out, you would get securities worth $480 million. You would stand a market loss of $107.7 million.[37]

Plaintiff charges Mr. Timmins with a misstatement adding, "At least chairman Janis thought that, under Washington Federal's proposal, a loss to the FHLBB of $107 million would be sustained." That Mr. Janis understood this was a market loss is revealed by his response to Mr. Timmins. "So in other words, if the market stays the same, we would wind up with a $107 million loss." Later, he said, "Under the proposal . . . we are currently reviewing, if the market stays the same, the loss would be $107 million." At no time did Mr. Timmins call it an out-of-pocket loss. He made it clear that the "[FHLBB] would stand a market loss of $107.7 million." Hence, there is no misstatement.

Chairman Janis combined the market loss of $107.7 million with the $80 million needed for March funding in discussing the cost of the Association proposal. He asked for alternatives. Mr. Ewing, director of FSLIC, outlined them: (1) a liquidation and payment of insurance; (2) appointment of a receiver and the simultaneous transfer of assets and liabilities to another association; (3) voluntary merger. Mr. Ewing estimat-

ed the cost of alternative (1) as $133 million and that of either (2) or (3) roughly projected as $115 million. These figures were elaborated in the "Outline of Alternatives" given to each Board member before the meeting.

In oral argument, plaintiff's counsel insisted that

> the staff allowed the Board to act on Washington Federal with no idea of its true condition, with no idea how it got to where it was, what had happened to this fine institution, or how Washington Federal intended to deal with its problems because it was still an independent viable organization functioning under its board of directors, and it intended to and developed plans, multi-plans, as the Federal Home Loan Bank Board kept dallying with it, plans to deal with whatever the crisis was.

Unquestionably, the Board would have been better informed on March 14 if as background material, each member had been supplied with the 1978 and 1979 reports of examination. In the alternative, they would have benefited from reading the several attachments to Arnall's memorandum to Myers dated January 9, 1980, itemized, *supra,* at p. 362. Also they would have gained additional insight into Washington Federal if the Arnall memoranda of March 10, previously reviewed, and March 7 (relating to the supervisory history of the Association) had been furnished to each Board member. But since the true condition of the Association in March 1980 is the relevant factor to be considered under the first ground upon which the Board based the receivership, the question is whether the Board was sufficiently informed as to this true condition in the meetings of March 14 and March 18, 1980.

The true current financial condition of the Association unfolded when Mr. DiPrete asked:

> Then if Mr. Marcis is correct, at least over the next couple of months, we would be anticipating that mortgage yields would be going up. Therefore, if anything, we would tend to be increasing our loss.

Mr. Timmins answered, "Correct."

---

**37.** Mr. Janis asked, "Where does the bulk of that [funding those commitments] fall?" Mr. Timmins responded, "The bulk of it falls due between now and the end of June, 1980." Mr. Janis then asked:

One thing we haven't talked about and might conceivably be relevant is the timetable under which either a response has to be given or should be given to the association or an election made as to one of the alternatives. Is that a factor?

This prompted a question from Mr. Janis and a response from Mr. Timmins:

Mr. Janis: What is the immediacy of this situation?

Mr. Timmins: The immediacy is that Monday there is a margin call from First Penco for our securities with a market value of $2.9 million. There is question as to whether or not the association could meet that. There is then another margin call on the 19th, a major margin call of $6 million as to which, if the broker is willing to repo it, there may only be a call of 240; if he doesn't, there is a $6 million call. On the 20th there is an additional $6 million and it goes up throughout the rest of the month.[38]

He then spoke of the Association's ability to meet these fundings:

The association's where-with-all to meet these is in more than considerable doubt; as a matter of fact at a meeting in this building yesterday with the chairman of the board of the association, he admitted to us that he was without resources probably to meet any of these calls. So that the immediacy is here and is beginning Monday afternoon, in all likelihood that the association will be unable to meet a margin call.

Thereupon Mr. Janis asked the question, "Does this amount to their operating in a unsafe and unsound manner?" And Mr. Timmins answered, "In my opinion it is." Mr. Berkow then added:

In my opinion, based on the statements that they made to us yesterday clearly indicating that there was no alternative but to come to us with this proposal, that unless we agree to this proposal, they would not be able to meet their commitments that were forthcoming within the next week. And I would say that that would clearly indicate that they would be in an unsafe or unsound condition to continue operations.

Thus it is clear that the true financial condition faced by the Association in March was disclosed to the Board.

Staff recommendations concerning the proposal were then requested by chairman Janis. Mr. Taylor started with this "point of view":

The picture I painted from the future prospects of the association's proposal taking effect is so disastrous that I personally would recommend against that proposal.

His reason was stated:

[T]his proposal would ... result in an association that was insolvent; and secondly, ... the proposal would require the FSLIC to assume the market risk that I think has brought this association to the position that it is in now.

Mr. Ewing felt that "that particular proposal has sufficient uncertainty to cause the FSLIC to be in a very precarious position." He felt that the Association's proposal "is not a workable proposal," his reason being "the uncertainty that the market will stay exactly where it is now and that's how the losses that they projected were projected." He added:

I also feel that the cost of carry of the commitments and the borrowings would be sufficiently large enough to, at some point in the future, possibly render the association in an insolvent position.

General counsel indicated:

The Board would have the authority perhaps to go ahead with the proposal as submitted by the association, although I must say it seems a little far-fetched to me, considering the basic objectives of home financing. I think, however, that there is a great deal on the record here which would suggest that the exposure to the FSLIC is such that in its discretion

---

**38.** Mr. Sterbank's March funding schedule, prepared on March 6, indicates a total of $82 million in calls coming due between March 6 and March 31, $52 million in dollar reverse repos and $30 million in standby commitments.

the Board could find basis not to go along with this proposal.

He added:

I think the thinking of the economists and the Board itself suggests that this may be throwing good money after bad, including the advance which is now due. I think there seems to be a basis here for the Board to reject this proposal even though there is authority if it were to so find, probably to accept it.

One other staff member, Mr. Hall, commented:

It appears to me, in terms of the proposal made by the association, that if our projections and the projections that OES has made on operating losses of $32 million or $36 million a year are correct or anywhere near correct, that that would not be a solution, it would be a postponement, and in addition, would increase the ultimate exposure of the Insurance Corporation to loss, not only by the market loss which is a gamble at best but also by the depletion completely of net worth.

This led Mr. DiPrete to ask Mr. Hall whether "the year-to-year loss in the range of $30-odd million made it more expensive for FSLIC. Would that make it necessary for FSLIC to backup and consider liquidation?" Mr. Hall answered, "It might, certainly that would be one of the alternatives that the Bank Board would again have to consider in a very short period of time."

Mr. DiPrete's apparent acceptance of the projected "year-to-year loss in the range of $30-odd million" was similarly voiced by Mr. Janis at another point in the meeting. He had said to Mr. Taylor, "And that they're

anticipating an annual loss of the nature of $34 million?" When Mr. Taylor responded "[o]n the order of $32 million," Mr. Janis repeated the figure. Mr. Taylor then said, "But in any event, we would be looking forward to an insolvent operation in a very short period of time."

In accepting the accuracy of the staff projected $32 million loss that the Association would sustain annually under its proposal, Messrs. Janis and DiPrete may well have relied on Mr. Taylor's explanation of the figure's source. He noted that while Washington Federal was "trying to work out of this situation, [it would] have an earnings deficit which [the staff] estimate[d] to be on the order of $32 million per year. That's based on current money market interest rates using dollar repos without yield equivalency." [39]

Since the meeting transcript shows that the Board members were aware of R–48, it must be assumed that they knew that Mr. Taylor was talking about the $32 million per year loss incidental to the use of fixed coupon dollar reverse repos. However, none of the earlier or later quoted statements of Board members would indicate that the Board intended to apply R–48 retroactively to the finances of the Association so as to render it already insolvent. Thus in this exchange, chairman Janis, despite R–48, the accounting techniques requirement, still recognized that Washington Federal at that time had a net worth of $12 million:

Mr. Janis: What is their net worth at present?

---

39. The $32 million figure was computed by Messrs. Timmins and Saalman "not contemplat[ing] the use of yield maintenance dollar reverse repurchase agreements". As explained by Mr. Timmins, they used "Purchase Price" figures from the Association's "Summary of Commitment Position at 2/29/80" to determine "the average outstanding loans" for a period of 12 months. They came up with "a weighted average borrowing for the year of approximately $400 million." They determined "that the interest on the borrowed money at 17 percent minus the earnings on the securities acquired of approximately 9 percent would be a negative carry of 8 point." By multiplying the 8 point times the $400 million, they arrived at a "deficit earnings" on the transactions of $32 million.

Mr. Glueck testified to the anticipated deficit with yield maintenance dollar reverse repos. Referring to the blue book, he reported the effective cost of borrowing through 12/31/79 to be 10.197 percent. The yield on the securities was calculated to be 9.94 percent with a resulting negative spread of .248.

No testimony was offered to explain this wide disparity in the cost of borrowing (17 percent versus 10.197 percent). When counsel were asked by the court for an explanation at final argument, they were unable to offer one from the record.

Mr. Taylor: Their net worth at present, according to their accounting technique, is $12 million. We have some concern that that involves some accounting techniques that we would not necessarily find acceptable.

Mr. Janis: Well, whether you would or whether you wouldn't, at the most the net worth is $12 million?

Mr. Taylor: That's right.[40]

In their statements regarding the projected $32 million a year loss, neither Mr. Janis nor Mr. DiPrete indicated that this projected loss, based on a required use of fixed coupon dollar reverse repos under memorandum R–48, was the basis upon which they voted to deny the Washington Federal proposal. While it is fair to assume that the projected loss was one of the factors which the Board members considered in voting on the proposal, there is no basis for assuming this was the only factor the Board considered.

Shortly before chairman Janis formulated the proposal upon which the Board members voted, Board member Dalton gave five reasons for deciding against its approval:

(1) The proposal "depends on too many variables in the market place."

(2) It "would require waivers of at least two regulations" [forward commitment regulation and outside borrowing regulation].

(3) It would require waiver of one of our R memos. [Dalton elaborated, "They're asking for forbearance from accounting techniques; and as I understand it, their proposal is not in accordance with general[ly] accepted accounting practices."]

(4) "From the standpoint of both a business judgment and one of public policy, I question the Board's advisability in ap-

proving this type of proposal to an institution that, as I understand it, the staff comments from Mr. Berkow yesterday, we're dealing with an institution that perhaps is in an unsafe and unsound situation currently."

(5) "And finally the thing that bothers me about the proposal is the precedent that it would set for the Board in that this has not been done before."

He ended by stating, "I really don't see the justification for approving the proposal of Washington Federal."

While Board member Dalton's understanding that Washington Federal's "proposal is not in accordance with general[ly] accepted accounting practices" was in error (apparently the issue still has not been finally settled by the Financial Accounting Standards Board (FASB) of the AICPA), the four other reasons for his decision are unrelated to R–48. Significantly, neither Mr. Janis nor Mr. DiPrete raised any objection to Mr. Dalton's statement of reasons for not accepting the Association proposal. Hence there is no basis on which to conclude that they, differently from Mr. Dalton, voted to deny the Association's proposal exclusively on Mr. Dalton's third reason relating to R–48. Indeed, the proposal as stated by Mr. Janis listed the request for a $78 million advance and the request for a $510 million guarantee ahead of the Association's request for forbearance of accounting techniques (R–48).

(2.)

Implicit in Board member Dalton's comments about memorandum R–48 is the assumption that the memorandum was binding on Washington Federal. Early in the meeting, OES director Taylor assumed the

---

**40.** Mr. Janis' state of mind is significant considering that Mr. Timmins said he told the Board at the morning briefing session on March 14:

I explained to the Board that under R–48 the Association was essentially insolvent; with respect to the accounting requirement, that losses be booked on yield maintenance reserve repurchase agreement, at least to the extent of approximately twelve to thirteen million dollars.

This figure is based on the February 29 Muldoon letter received by the Board members as an attachment to the February 29 Taylor memorandum. It called attention to a background memorandum "which concludes that if the Association followed the accounting procedures in memorandum R–48 dated January 29, 1980, that its total losses as of December 31, 1979 would approximate $25,291,906 as compared to a net worth position of $12,935,463."

same in describing the Association's proposal. He said:

And that under this flag that they be permitted to wind down their positions by rolling out the commitments using reverse repos; this would require forbearance from accounting techniques which would force them to account for reverse repos in those transactions as sales and purchases and thereby taking losses.

This is a condensation of R–48, which will now be discussed.

On January 29, 1980 Mr. Taylor issued a memorandum numbered R–48. The memorandum was addressed to the professional staff and dealt with the issue of proper accounting for "dollar reverse repurchase agreements and loans of securities with differing interest rates." The memorandum stated:

Where the risks of ownership are transferred to the buyer or the security to be repurchased is not substantially identical to the security sold, the transaction involves a sale and purchase and is not a financing transaction.

In applying this general proposition to dollar reverse repurchase agreements, the promulgators looked to whether the transactions involved "the exchange of securities with different coupon interest rates." Such securities were deemed "not substantially identical," and hence an exchange of these securities was to be recorded "as sales and purchases of securities at market prices with profits and losses recorded in the period incurred." Thus, while fixed coupon dollar reverse repos could be treated as financing transactions, yield maintenance agreements had to be "accounted for as sales and purchases of securities at market prices, with profits and losses recorded in the period incurred."

Plaintiff supports its contention that the Bank Board's decision to place Washington Federal in receivership was an arbitrary and capricious one by arguing that the staff improperly applied R–48 to Washington Federal and improperly characterized the memorandum in discussions with the Board. Plaintiff asserts that R–48 did not, and does not, have the effect of law, that the memorandum was applied retroactively to reverse repo transactions undertaken by plaintiff, and that the Board was told that R–48 represented generally accepted accounting principles (GAAP) while indeed the American Institute of Certified Public Accountants (AICPA) has not approved the principles stated therein. Plaintiff asserts that it followed an opinion of its independent auditor, Peat, Marwick & Mitchell (PMM). PMM's local office issued the opinion in a letter on October 26, 1979, see n.16, supra.

Defendants respond that "R–48 is not a real issue here" because the Board did not rely upon it in reaching its conclusions as to the condition of Washington Federal. Instead, defendants state that the staff applied R–48 in evaluating and analyzing Washington Federal's requests of March 13, one of which was relief from the accounting treatment required by the memorandum. Defendants argue further that the burden was on plaintiff to prove that R–48 does not reflect GAAP and it failed to meet that burden.

Certain fringe evidence suggests that the savings and loan committee within the American Institute of Certified Public Accountants issued an "exposure draft" of a proposed statement of position "Accounting For Dollar Reverse Repurchase and Dollar Repurchase Agreements," which differentiates the accounting treatment of fixed coupon dollar reverse repos from yield maintenance dollar reverse repos as provided for in R–48. It appears that a second draft, issued March 24, 1980, specified that the statement of position "should be applied prospectively to DRR transactions entered into after 12/24/80." However, application was "encouraged." The Financial Accounting Standards Board (FASB) of the AICPA apparently has not yet acted on the draft, the court is told by plaintiff's counsel.

It is concluded that the issue involving the binding character of R–48 is a legal one. How the Board applied R–48 is a factual question. But to resolve either the legal or factual aspect of R–48, it is unnecessary for the court to determine what is generally

accepted accounting practice concerning the accounting treatment of dollar reverse repos. Indeed, it may be the question is unresolvable until the accounting profession acts.

The court turns first to the legality of R–48 as binding on savings and loan associations. Plaintiff argues that R–48 has neither the force nor effect of law in that it is not a formal rule, interpretative rule, or general policy. Defendants argue that R–48 is an interpretative rule which serves to flesh out 12 C.F.R. § 563.23–3 and which played no part in the Board's decision to place Washington Federal in receivership.

■ 5 U.S.C. § 553 sets forth the requirements of notice and hearing attending formal rule making. It is not suggested by defendant that such required formalities took place relative to R–48. From the record it is apparent that there was no attempt to formally promulgate R–48. Hence the memorandum cannot achieve the status of a valid agency rule.

■ Under 5 U.S.C. § 553(b), excepted from general notice requirements are interpretative rules and general statements of policy. Neither category is defined by the APA. An interpretative rule is distinguished from "a substantive or legislative rule [which] has the force of law." *Guardian Federal Savings & Loan Assoc. v. Federal Savings & Loan Corp.*, 589 F.2d 658, 664 (D.C.Cir.1978). "An interpretative rule is merely a clarification or explanation of an existing statute or rule." *Id.* Interpretative rules generally give the public notice of agency statutory or rule construction. *Id.*

R–48 does not clarify or explain the relevant phrase of § 563.23–3, "specific principles or procedures on particular accounting . . . matters." Rather, the memorandum defines criteria for the "proper accounting treatment" in transactions involving the exchange of securities with different interest rates. Whether the exchange of a security involves a "sale and purchase" or a "financing transaction" turns on whether the "security to be repurchased is not substantially identical to the security sold." Thus a sub-

stantive definition is announced. Even more precisely, the "exchanges of securities with different coupon interest rates" are pronounced to be exchanges of securities that are "not substantially identical" and therefore "must be recorded as sales and purchases of securities at market prices with profits and losses in the period incurred." Plainly enough, the memorandum speaks substantively and perhaps "legislatively." Section 563.23–3, to the extent here pertinent, provides that each insured institution shall

(a) Employ such specific principles or procedures on particular accounting or reporting matters as the Corporation may require by regulation or otherwise.

Only by "regulation" may the Corporation require "specific principles." A substantive regulation, such as R–48, must be promulgated in accordance with the APA.

Likewise, R–48 is not a general statement of policy. "The term 'general statements of policy,' has been explicated in the Attorney General's Manual as embracing 'statements issued by an agency to advise the public *prospectively* of the manner in which the agency proposes to exercise a *discretionary* power.' " *Guardian Federal, supra*, at 666 (emphasis added). Discretion in the administrative officer was a critical factor to the *Guardian Federal* court. "If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is—a binding rule of substantive law." *Id.*, at 666–67.

R–48 contains no discretionary language; securities with different coupon interest rates "must" be recorded as sales and purchases. While R–48 accounting techniques were not, according to Mr. Taylor, being imposed upon the associations, the examiners were being instructed to assess associations according to the principles established therein. The very fact that Washington Federal was seeking relief from R–48 in the form of a "waiver" granted by the Board shows that the OES staff did not have any discretion in applying it.

■ The foregoing analysis convinces the court, and it is determined, that R–48 had no binding effect on an insured association; and thus, it did not bind Washington Federal. Therefore, it would be arbitrary and capricious, and in violation of law, if the Bank Board had found, but only if it had found, that Washington Federal was insolvent by reason of the application of R–48 to its prior yield maintenance dollar reverse repurchase transactions and if, on that finding, the Bank Board solely rested its decision to place the Association in receivership.

Mr. Timmins was frank to admit that "in his mind," on January 29, 1980, when R–48 was signed by Mr. Taylor, he applied the memorandum to all of the yield maintenance dollar reverse repurchase agreements that Washington Federal had undertaken in November, December and January. He also agreed that in the Board briefing session on the morning of March 14 he had "explained to the Board that under R–48 the Association was essentially insolvent." Nevertheless it is the action of the Board and not the mental process of a staff member that is critical. The Board did not at the afternoon meeting of March 14 apply R–48 retroactively to the finances of the Association so as to render it already insolvent.

R–48 probably led Messrs. Timmins and Saalman on March 13 to calculate the cost of doing reverse repos without yield equivalency, i. e., they analyzed the Association proposal in terms of fixed coupon dollar reverse repos. The Board members may have assumed, as they were in effect told by Mr. Taylor, that it was because of R–48 that "current money market interest rates [were applied] using dollar repos without yield equivalency," thus resulting under the proposal in "an earnings deficit [estimated] to be on the order of $32 million per year." Board members may well have believed that it was because of R–48 that, in Mr. Taylor's words, "[W]e would be looking forward to an insolvent operation in a very short period of time." Future insolvency due to R–48 may have been one of the factors—although R–48 was only one of five reasons given by member Dalton—considered by Board members in denying the Association's proposal. But future insolvency is not a statutory ground upon which the Board was authorized to order receivership, see section 1464(d)(6)(A)(i), and no such ground was asserted by the Board in ordering the receivership.

■ In denying the third element of Washington Federal's proposal, the Board indicated that it believed that R–48 prospectively had a binding effect on the Association. While this was arbitrary and capricious, that did not void the later ordering of the receivership because, as it will be seen, the Board on March 18 did not decide that the Association was insolvent and certainly it did not decide that the Association was retroactively insolvent by reason of the application of R–48.

## IV.

### A.

Once the Bank Board denied Washington Federal's request for a $78 million advance to meet March funding commitments, the inability of the Association to transact business on and after March 19 became a reality. Chairman Janis gave standing instructions to work for a voluntary merger as a high first priority. Bank Board and FSLIC representatives were dispatched to Cleveland on Saturday, March 15 to work for a voluntary merger. They were instructed, however, to prepare for a receivership and a simultaneous purchase and assumption transaction in the event the voluntary merger did not materialize.

At the request of Hall of the FSLIC, supervisory agent Muldoon arranged for two unpublicized meetings of savings and loans interested in entering into a purchase and assumption transaction which were held Sunday afternoon, March 16, at the Bond Court Hotel in Cleveland.

The attendees were told that although the purchase and assumption was couched in terms of a receivership, as Mr. Hall put it, "We still had hopes that a consent trans-

action could be worked out." Bids were to be submitted by 5:00 p. m. on March 17; Bank Board representatives felt "it would be necessary to have the transaction consummated by the close of business on March 18."

Washington Federal was not notified of this meeting. However, at the meeting of its directors on the evening of March 17, Mr. Glueck stated that he had learned of the meeting. Representatives of the Bank Board and the FSLIC attended the Association's meeting. They submitted to the directors for approval a voluntary merger resolution as a substitute for an earlier one sent to the directors. This new resolution did not name the merger partner or indicate the names of the directors of the resulting association. The merger was conditioned upon the execution of a purchase agreement, providing among other things for the FSLIC to purchase all or substantially all of the GNMA security portfolio "formerly belonging to Washington Federal." The Association countered with a resolution which provided for release of liability of all officers and directors unless fraud was alleged and proved. It further provided that "any resulting institution [would] enter into term contracts for all present officers of Washington at their current level of income, including all other present benefits." Accompanying this resolution were directors' statements at the meeting that they had done nothing wrong. The discussion was at times acrimonious. Bank Board representatives exited after they promised to take up the Association's proposed resolution with the Bank Board.

Following a telephone communication between the Bank Board staff in Cleveland and chairman Janis and the staff in Washington, the chairman convened a meeting of the Bank Board at 11:00 p. m. Chairman Janis proposed a motion to give guidance to the Cleveland-based staff on how to proceed with negotiations with the Association. The motion was in three parts. First, in response to the Association's request to know the name of its merger partner, the motion provided that it should be given the name of Broadview Savings and Loan, the successful bidder of those who submitted bids on Monday pursuant to the Sunday sessions. Second, the motion provided that the Bank Board would agree not to pursue any individual actions against the directors of the Association except for any commission of fraud. Third, the Association's request for the employment contracts of 13 officers for a specific term at the same salaries was rejected.

Mr. Dalton moved to amend the second part to provide for payment of the directors' attorneys fees should the directors be sued by the Board on any ground other than fraud. Chairman Janis and member Dalton voted to approve the motion as amended. Mr. DiPrete voted to deny the motion because he disagreed with the second part of it.

On the evening of March 17 Mr. Hayes, associate general counsel of the Bank Board, spoke with Mr. Leibold, Association counsel, and Mr. Glueck. Mr. Hayes communicated the Board's motion to Mr. Leibold and Mr. Glueck. Mr. Glueck testified that he learned that Broadview Savings and Loan was the proposed partner on the evening of the 17th or morning of the 18th. A regularly scheduled meeting of the Board of Directors of the Association was scheduled for 5:00 p. m. on March 18. Bank Board representatives had attempted to get the Association to advance the time of the meeting. They did not succeed.

About 3:30 on the afternoon of March 18 a call was initiated by Mr. Ewing and Mr. Hall to the Bank Board office. The chairman's administrative assistant, Ms. Fair, was told that they had information that "one of the Cleveland newspapers would be breaking a story with respect to Washington Federal," and that "one of the TV channels would be making some kind of a presentation also with respect to Washington Federal."

That evening, Mr. Hall suggested that these events "might preclude any reasonable effort to protect the depositors of Washington Federal, because a run might develop." He also noted that the offices of

Washington Federal would close at about 4:30 and that a decision from the Bank Board had to be made "if [they] were to effect the transaction that night."

A time came when he heard chairman Janis over the open telephone line talking to the other Board members. He fixed the time at 4:25 p. m. Mr. Hall asked if the order or resolution appointing the FSLIC as receiver had been approved, and the chairman responded. Mr. Hall did not indicate the specific response but said he was given the number of the resolution, 80–181. On the resolution copy typed at the Bank Board's Cleveland law firm, Mr. Hall filled in the resolution number and the date. He signed the resolution, "Gene L. Hall, assistant secretary." (The chairman had previously appointed him assistant secretary of the Board.)

The notes of the Board stenographer (now deceased) support Mr. Hall's account. They show a colloquy involving Messrs. Janis, Hall and Ewing then, at 4:25 p. m., the calling of a Board meeting by the chairman and the appointment of Gene Hall as assistant secretary to the Board. The ensuing conversation is between Messrs. Janis, Ewing and Miskovsky. It is Mr. Hall's testimony that at 4:35 to 4:40 p. m. he gave copies of resolution 80–181 to Messrs. Hayes, Reese, and Pattullo, who departed immediately for Washington Federal's main office. This would account for the absence of Mr. Hall's name from the further telephone conversation notes.

The stenographic notes then record "Board Meeting 5:05 3–18–80" and list the persons present. The confusion was explained by Mr. Janis in deposition testimony:

> The first part of the meeting was stenographically recorded.
>
> I then felt that we should repeat the vote on tape because of the closed nature of the meeting, and so I ordered a tape recorder to be brought to the room, and the vote was repeated into the tape recorder at approximately 5:00 o'clock.

41. Resolution 80–184 and resolution 80–185 are ancillary to the previous resolutions and need

Mr. Reese confirmed that he, Mr. Hayes, and Mr. Pattullo left the Union Commerce Building (in which the Board's law firm is located) at 4:40 p. m. About 25 minutes later they arrived at the Washington Federal building. There, Mr. Reese, who noted the time as 5:15 p. m., observed Mr. Hayes serve "papers on Mr. Glueck and Mr. Leibold, the association legal counsel."

At 5:15 to 5:20 p. m., Mr. Hall received a call from Mr. Hayes. Thus this was after the resolution was served on Washington Federal, using Mr. Reese's timing.

■ The stenographic notes show that the meeting commenced at 5:05 p. m. and recessed at 5:10 p. m. If the Board adopted the resolution at 5:10 p. m., that adoption, substantially simultaneous with the time of service of the resolution on Washington Federal, would ratify the action.

The stenographic notes record that the Board reconvened at 6:00 p. m. In the meantime, Mr. Dalton, who had attended the first session of the Board meeting, had departed. He was, however, on an open telephone line and in communication with the Board during the resumed portion of the meeting. The second session lasted from 6:00 to 6:15 p. m. Four resolutions were considered and adopted, 80–182, 80–183, 80–184, and 80–185.[41]

It was Mr. Hall's recollection that the open line to the Bank Board continued until 6:30 to 6:40 p. m. Thereafter it is his recollection that he signed the four resolutions, 80–182 through 80–185, typed at the Cleveland law firm. He also signed an authorization for Mr. Edward McGuirk to execute certain documents for the FSLIC. Mr. Hall witnessed Mr. McGuirk's signing of the purchase and assumption agreement. On March 17 (presumably in connection with Broadview's bid), Mr. Paul Csank, counsel for Broadview, had signed the purchase and assumption agreement and the indemnity agreement on behalf of Broadview.

Plaintiff points out that

not be described.

FSLIC told Broadview that it could proceed to take over the offices of Washington Federal, and that instruction was delivered well before 6:15 p. m. on March 18 at which time the Federal Home Bank Board authorized a purchase and assumption transaction.

The evidence indicates that it was after the Bank Board representatives left for Washington Federal that Mr. Csank, on instruction from Mr. Hall, released Broadview personnel to proceed to the Washington Federal offices.

 The entry of Broadview Savings and Loan personnel into Washington Federal offices is found to have occurred before the P&A agreement was executed by the FSLIC as receiver. However, the adoption of the receivership resolution, 80–181, the purchase and assumption agreement authorization resolution, 80–182, and the execution of the purchase and assumption agreement ratified the entry. Plaintiff does not charge performance of specific wrongful acts by Broadview Savings personnel by virtue of the premature entering of the offices of Washington Federal, and no actionable injury is apparent on the record.

### B.

 Resolution 80–181 determined the first ground existing for the appointment of a receiver for Washington Federal pursuant to 12 U.S.C. § 1464(d)(6)(A) to be:

Washington Federal is in an unsafe and unsound condition to transact business in that it is unable to meet its liabilities or obligations . . . .

The Board was not required to make factual findings in support of its receivership order. Based on the administrative record, corroborated by undisputed facts in the judicial record, this court makes these factual findings which show the true financial condition of the Association on March 18, 1980 and which support the Board's first ground of receivership:

1. On the next day, March 19, 1980, Washington Federal had coming due dollar reverse repurchase agreements totaling $52 million. In addition, under standby forward commitment contracts, Ginnie Mae securities totaling $10 million were due to be funded.

2. From March 20 through March 31, 1980 under further forward contracts, Washington Federal was obligated to take delivery of Ginnie Maes totaling $18 million.

3. In the period April 1, 1980 through May 31, 1981, under dollar reverse repurchase agreements, Washington Federal was obligated to fund Ginnie Maes in the face amount of $174.5 million; and under forward commitment contracts, Washington Federal was obligated to fund $350.5 million of Ginnie Maes, delivery of which securities was very likely to be put to the Association.

4. As explained to the Board at its meeting of March 14, 1980, by virtue of mark to market provisions in dollar reverse repurchase agreements and in forward commitment contracts, margin calls for additional collateral amounting to $14.9 million had been made, or likely would be made, through March 20. According to the Washington Federal March 13 submission to the Board (PX 84), on February 29, 1980 the mark to market requirement to be funded in March was $20.9 million.

5. The Association had informed the Bank Board staff, as reported to the Board, that the Association's only source of meeting its immediate (March) funding needs was "the Bank Board System," and the Bank Board also knew that on March 14 it had denied the Association's request for advances totaling $78 million to meet its March funding needs.

6. By reason of the Association's dollar reverse repurchase agreements and other borrowings and the Ginnie Maes and FHA/VA mortgages pledged as collateral thereunder, and by reason of certain nonpledgeable collateral, on March 18 the Association had only $17.5 million available collateral.

7. Collateral held as margin on outstanding commitments pursuant to mark to market agreements had a book value of

$78.9 million or a market value of $58.9 million. If the Association's future commitments were not funded, the Ginnie Mae securities and FHA/VA mortgages pledged with dealers would be forfeited pursuant to the mark to market agreements.

## C.

### (1.)

Plaintiff argues that the Bank Board failed to consider as a relevant factor the supervisory history of the Association. Omitted from the Board's consideration, plaintiff states, were the reviews of Washington Federal's investment strategy and waiver requests, the positive comments on "the association's abilities in that area," Klancher's conclusions on the Association's projections, and Duffus' recommendation on the waiver request.

Indeed, the thorough examination reports of 1978 and 1979[42] were not directly placed before the Board. However, the OES problem book sheets of July 31, 1979 and its update, entered in December 1979, contain much of the information plaintiff asserts the Board should have considered.[43] The July 31 report reflected the growth in the Association's net worth from $1.2 million in 1971 to $9.6 million in 1978. While reporting a "net underhedged position of $303.0 million," Mr. Arnall included the statement, "[T]he examiner was very impressed with management's expertise in this area and assigned the association a '1' rating." Also included was a statement of the Association's waiver requests as set forth by Mr. Glueck at the July 6, 1979 meeting. Mr. Arnall concluded:

> The association has submitted projections showing the association's financial condition if such forbearance is granted and if it is not. We have asked the examiners, who commenced an examination of the Association on July 30, to evaluate these projections.

The December entry (which included statistics of the Association's financial condition as of September 30, 1979) added the comments of the examiners on the projections:

> All six projections were thoroughly reviewed and analyzed by the examiner. The basic assumptions were reviewed for reasonableness. The method of calculation, along with the computation of amounts and percentages which make up the various statements, was checked and found to be accurate. The calculation of fee income for each projection was prepared based on generally accepted accounting principles as now required by the regulations.

> Fee income figures for the year 1979, as calculated for the "A" projections, will be less than shown. Because of the provisions of Insurance Regulation 563.17–3, the sale of standbys to purchase securities was discontinued as of June 1, and no fees have been taken since then resulting in a severe drop in fee income.

> The projection calculations, however, were based on the assumption that the association would be permitted to proceed with its proposed secondary market activities in the not too distant future. Since no standbys are being sold, it appears that the final income figure will be considerably short of what was projected.

As is evident, Mr. Klancher's statement as to the reasonableness of the projections was included.

This court held earlier in this opinion:

> The "true condition" of Washington Federal is a factor that is relevant to and is subsumed under ground (1) . . . It is concluded that while earlier months provide a pertinent background to ascertain the Association's true financial condition, the month of March 1980 is the time frame in which the true condition must be appraised.

---

42. For a discussion of these reports, *see* pp. 354, 355.

43. The court held these sheets to be part of the administrative record as documents submitted to Board members. *See* p. 352, *supra*, and appendix B.

The question to be asked then in terms of the relevancy of plaintiff's supervisory history as a factor is whether there was anything in the reports which, if known by the Board, might have affected its evaluation of the Association's condition in March 1980. The court finds that there was not. The positive comments by Klancher were present. The growth in net worth was present, as was information, although sketchy, reporting the waiver requests. There was nothing in the supervisory history unreported to the Board which would have mitigated the "true condition" of the Association in March, 1980 as determined by the Board. Despite approval of the competency of the Association's officers and directors expressed by examiners in 1978 and 1979, had this been communicated to the Board, it still had substantial bases on which to conclude that Washington Federal was in an unsafe and unsound condition to transact business in March of 1980.

### (2.)

Plaintiff argues that a relevant factor ignored by the Board was "[t]he effect on Washington Federal's secondary market operations of the forward commitment regulation as proposed and adopted." Messrs. Glueck and Sterbank testified, in substance, that the regulation affected the Association's relationships with its brokers and hence affected its ability to obtain hedges. Mr. Connolly testified that a grant of waiver would not have affected its position because of the withdrawal of the savings and loan industry from the GNMA market during this period. He also said that granting a waiver to one association would not have affected the availability of hedges. Mr. Timmins, during the March 14 meeting, testified:

> Mr. Janis: And why did they stop hedging?
>
> Mr. Timmins: The hedges disappeared from the market.

Mr. Janis: In other words there was nothing on the short side available?

Mr. Timmins: That's correct; to the best of our knowledge.

The lack of dealer contacts, claimed as the reason for plaintiff's inability to buy forward commitment contracts from persons willing to stand by to take delivery of GNMA's from Washington Federal, is inconsistent with plaintiff's experience in using dollar reverse repos. Nine dealers and one savings and loan association were willing to engage in such transactions with Washington Federal when it turned to this short-term borrowing procedure beginning November 1, 1979. Coupling this undisputed evidence with the cited evidence, it is rationally shown in the administrative record,[44] as explained in the judicial record, that "hedges disappeared from the market," as Mr. Timmins told the Board. Had there been sufficient hedges available in the market and had Washington Federal been able to pay for them, there were dealers ready to enter such hedging contracts with Washington Federal, or brokers would have been able to obtain parties to sell forward commitments (hedges) to Washington Federal.

Concluding his statement of forward commitment management philosophy incorporated as part of the 1978 report of examination, chairman Glueck expressed his greatest fear:

> The greatest fear in a forward commitment program is that interest rates will rise above the commitment level, therefore, exposing the committor to excessive losses.

To "eliminate this possibility," the Association, as a second safeguard, "hedg[ed] every commitment to buy." But "hedges disappeared from the market." With its forward commitment position unhedged be-

---

**44.** Also relevant to this issue is the Myers memorandum to Arnall which was attached to the Taylor memorandum and hence part of the administrative record. Mr. Myers stated:

> The reasoning that their relationships with brokers have some intrinsic value seems false. The securities business moves rapidly

toward any area of profit, but not as fast as in retreat when income is not to be found. They seem to have learned this judging by the broken contracts. Should they wish to renew the practice at some later date I doubt they will have trouble finding dealers to service them.

cause its forward commitment contracts had not been contemporaneously matched with hedges, see, supra, pp. 364, 365, the Association's "greatest fear" became a reality. Not only did "interest rates . . . rise above the commitment level," money-market rates stayed at that imbalanced level "exposing the committor to excessive losses."

This condition, not the adoption of the forward commitment regulation, impacted the Association's hedging activities and brought on the Association's unfundable volume of forward commitments in March 1980. Furthermore, the impact claim is still the waiver request although now clothed in the "relevant factor" garb. At oral argument the court put this question to plaintiff's counsel:

Isn't that just an indirect way, when you assert that, of challenging the right of the Board to issue the Forward Commitment Regulation, and if so, why didn't you go into court and challenge it, as you had a right to do, if you really believed it was invalid?

Plaintiff's counsel responded:

Mr. Ginn: Well, we do not take the position, your Honor, that we have a right or that we had a desire at the time to challenge the Board's Forward Commitment Regulation.

The idea that the Board can regulate forward commitment activity on the part of savings and loans is one that we accepted at the time and we accept today, and we are not indirectly challenging the Forward Commitment Regulation.

We are saying that the Board itself was responsible for the condition in which Washington Federal found itself in March of 1980, and that is a relevant factor that the Board ought to have considered at that time. That is, by March, 1980 the impact of the Board's Forward Commitment Regulation, coupled with total silence on the part of the Board previous to and subsequent to a regulation as to how Washington Federal was to conduct its business in light of that regulation, was a matter that was excluded from the Board's consideration.

The closest that anyone ever came was this slurring remark of massive speculation.

▆▆▆▆▆▆ To say "that the Board itself was responsible for the condition in which Washington Federal found itself in March of 1980" meets this court's requirement, set forth supra, at p. 354, that a factor to be relevant, must be subsumed under one of the grounds upon which the Board's receivership rests. However, despite counsel's abjuring the suggestion, plaintiff's argument in the court's mind is an attack on the validity of the regulation. As such it lacks merit. It is clear that the very purpose of section 563.17–3 was to limit the activities in which plaintiff, and any similarly active association, was engaging. In an apparent attempt to mitigate the effect of the regulation on associations engaged in forward commitment activity, the regulation "grandfathered in" the commitments in excess of the regulation. Knowledge of the effect of the regulation on various associations must be imputed to the Board. Its failure to specifically note the effect cannot be said to constitute arbitrary and capricious behavior.

More important, plaintiff has not shown that the Board was required to consider as a relevant and mitigating factor the alleged causal relationship between the regulation and plaintiff's financial condition even if it did exist. Certainly the governing statutes impose no requirement that such a relationship be considered. Indeed, "government regulation—by definition—involves the adjustment of rights for the public good." Andrus v. Allard, 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979). There will of necessity be restrictions placed upon the operations of business, as defendant states, "to protect the health, safety and welfare of the public." Requiring an agency to take into account the effects of its regulations on the entities being regulated would result in a subordination of the concern with public good to that of the regulated entity.

### D.

The second ground upon which the Bank Board rested its receivership order declared:

(2) The assets of Washington Federal have been substantially dissipated due to violations of law or regulations and to unsafe or unsound practices. . . .

This ground closely copies the wording of (ii) of section 1464(d)(6)(A). It neither particularizes nor elaborates the language. What provision of law or whatever regulation, if any, the Board may have had in mind when it adopted the resolution it did not specify. Nor do the transcripts of the meetings of March 14 or March 18 shed any light on the subject. At neither meeting was the Board given any facts by the staff, and no Board member asked any question or made any comment relating to the dissipation of the assets of the Association.

Defendants do not suggest that the basis of the second ground of resolution 80–181 was alluded to in either Board meeting or in any staff communication to the Board members. Defendants seek, however, to link the second ground with two regulations. In proposed finding No. 19, defendants argue:

The staff could reasonably conclude that the practice of entering into yield maintenance DRR's in the volume in which Washington Federal had engaged in such practice, in view of Washington Federal's exposure under its standby commitments, had resulted by March 18, 1980 in the Association's being unable to fund its "repurchase" commitments under such yield maintenance DRR transactions.

Continuing, defendants argue:

The staff could reasonably conclude that the Association's practice, undertaken in this volume and with full knowledge of its standby commitment exposure, led directly to the Association's inability to fund its "repurchase" obligations, and was inherently unsafe and unsound and in violation of 12 C.F.R. § 563.17, the regulation dealing with Management and Financial Policies.

Counsel does not say that the staff had so concluded, but rather that it "could reason-

ably conclude." However, even if the staff had so concluded, the administrative record is devoid of any evidence that indicates that these conclusions were communicated to the Board or that the Board had knowledge of or had thought about what counsel says the staff "could have reasonably concluded."

The second frailty in defendants' proposed finding is the imprecision of 12 C.F.R. § 563.17, the regulation allegedly violated by Washington Federal. It provides in pertinent part:

(a) For the protection of its insured members and other insured institutions, each insured institution and service corporation thereof shall maintain safe and sound management and shall pursue financial policies that are safe and consistent with economical home financing and the purposes of insurance of accounts and are appropriate to their respective types of operations.

Defendants fail to show how the alleged violation of this broadly worded regulation caused any dissipation of assets.

The staff, as has been shown, believed that R–48 was applicable, even retroactively, to require Washington Federal to record "as sales and purchases of securities at market prices with profits and losses recorded in the period incurred" all Ginnie Maes sold by Washington Federal under its yield maintenance dollar reverse repos. FHL Bank of Cincinnati staff had calculated a $25 million market loss to the Association if R–48 were applied to the $152 million in Ginnie Maes sold under yield maintenance dollar reverse repos during November and December 1979. This would indeed constitute a sizable dissipation of assets in violation of regulation 563.17 and its requirement that an association "must maintain safe and sound management." However, construing R–48 in conjunction with regulation 563.17 is not permissible in view of this court's holding that R–48 was not binding on Washington Federal, *see* pp. 383, 384, *supra.*

██ Defendants point out that Washington Federal's monthly reports, portraying "the Association's yield maintenance

DRR's as 'other borrowed money'," informed the Bank Board staff "that the Association was engaged in a deliberate violation of or a deliberate attempt to violate 12 C.F.R. § 563.8." Defendants then argue:

> Accordingly, the staff could reasonably conclude that the dissipation of assets of Washington Federal in an amount at least equal to $38.9 million [GNMA securities having a book value of $223.3 million less market value at time of sale of $184.4 million] arising as a direct result of the Association's yield maintenance DRR transactions ... was directly caused by Washington Federal's violation of or deliberate attempt to violate 12 C.F.R. § 563.8.

Under regulation 563.8, as of February 29, 1980, the Association exceeded the allowable borrowing amount by $141 million, *see* n.27, *supra*, treating outstanding yield maintenance dollar reverse repos as borrowed money as the Association did. At the Board meeting of March 14, 1980 associate general counsel Hayes informed the Board:

> The Association has asked for waiver of two regulations at least; forward commitment reg. and the limitation on outside borrowing. To the best of our knowledge I believe they have not violated the forward commitment reg., however, they are now and they have for some time been in violation of the outside borrowing regulation.

Since Washington Federal was continuing to violate the outside borrowing limitation regulation, the Board under 12 U.S.C. § 1464(d)(2)(A) had authority to serve notice on the Association setting forth the "alleged violation." In such a proceeding, it would not have been necessary to show that the violation of the outside borrowing regulation was causing a dissipation of assets of the Association. Having found a violation, the Board was empowered to issue and serve upon the Association "an order to cease and desist from any such violation."

■ However, if the continuing violation of the outside borrowing regulation were to be utilized by the Board as the basis for taking the more drastic step of basing a receivership order on it, it was essential for facts to exist that would warrant the Board to rationally conclude that "substantial dissipation of assets" was occurring and was due to the continuing violation of section 563.8.

Mr. Hayes did not tell the Board, and there is no showing that any facts were brought to the attention of the Board, that there was a substantial dissipation of the assets of the Association or that such dissipation, if existing, was "due to" the violation of the outside borrowing regulation. Nor can any such evidence be found in the administrative record or the judicial record.

■ Hence, it was arbitrary, capricious, and in violation of law for the Board to find in resolution 80–181 that the Association had sustained a substantial dissipation of assets due to a violation of law or regulation.

The Bank Board's second ground for the receivership order further charges that "the assets of Washington Federal have been substantially dissipated due ... to unsafe or unsound practices." No facts were mentioned in either the meeting of March 14 or the meeting of March 18 to support this finding. It is true that at the March 14 meeting Mr. Taylor made the following statement:

> The main concern I think that I want to leave with you at this point is that we have a situation where an Association has expressed to us that they have no alternative but to have this package put together. What I think we are saying is that this is a very clear case where we have an absolutely unsafe and unsound situation with this Association. And that's the present situation.

Obviously, Mr. Taylor was presenting the facts that eventually led the Board on March 18 to find that the first ground existed for appointing a receiver. Mr. Taylor's statement does not support the second ground of the receivership order.

However, in what is deemed to be a *post hoc* rationalization, the defendants now argue that "assets of Washington Federal have become substantially dissipated:"

(a) due to the pledge of approximately $60 million in collateral pursuant to mark to market agreements

\* \* \* \* \* \*

(b) due to Washington Federal['s] engaging in standby commitments.

It is apparent that the facts which defendants would offer to demonstrate "substantial dissipation of assets" are facts that underpin and support the Board's finding of the first ground for appointing a receiver. Moreover, none of these facts show a dissipation of assets. Even more important, the Board at no time heard or became cognizant of facts that constituted a dissipation of assets. Hence, for the reasons stated, it is concluded that the Bank Board, in resting its receivership order on the second ground contained in resolution 80–181, acted arbitrarily, capriciously, and not in accordance with law. However, as previously held, it is concluded that the Bank Board did not abuse its discretion in finding that the first ground existed for the appointment of a receiver.

### V.

Plaintiff Washington Federal attacks the legality of the decision of the Bank Board to deal with Washington Federal

through a purchase and assumption agreement and to appoint the Federal Savings and Loan Insurance Corporation ("FSLIC") as receiver with directions to carry out that decision with the successful "bidder," Broadview Savings.

Between 6:00 and 6:15 p. m. on March 18, the Bank Board adopted resolution 80–182, which authorized the FSLIC in its capacity as receiver for Washington Federal

to sell and transfer the assets and liabilities of Washington Federal and to enter into a Purchase and Assumption Agreement and an Agreement of Sale in the form of said proposed Agreements set forth in the Minute Exhibit file. . . .

Before reaching the question of the legality of the FSLIC as receiver to enter into the purchase and assumption agreement with Broadview, the court must deal with defendants' assertion that this issue is beyond the review of this court.

### (1.)

Relying upon 12 U.S.C. § 1464(d)(6)(A), defendants contend that Washington Federal may challenge only the appointment of the FSLIC as receiver. Since resolution 80–182, authorizing and directing the receiver to enter into the purchase and assumption agreement with Broadview, was adopted some 50 minutes after the FSLIC was appointed receiver by Bank Board resolution 80–181, defendants argue that review of the first resolution cannot reach the legality of the second resolution. However, testimony of Gene Hall, Chief, Problem and Rehabilitation Division, Office of the FSLIC, makes it quite evident that what is joined together in fact cannot be separated by abstract logic. Defense counsel put this question:

Mr. Hall: What would have happened if a receiver were appointed for Washington Federal and that appointment was not followed rapidly by a transaction of a transfer of assets and assumption of deposit liability by a healthy institution?

Mr. Hall answered:

There would have been a payout of insured accounts; and in this case, as I recall, the figures of approximately $160 million, and there would have been approximately $16 or $17 million of depositors who would not have been paid by the insurance company, but who would have [had] to wait until such time as the assets were disposed of, if there were sufficient assets to make full recovery.

 In several staff memoranda to the Board concerning Washington Federal from March 6 through March 18 and in Board meetings of March 14 and 18, use of a purchase and assumption agreement, either as part of a voluntary merger or in liquidation by receivership, was mentioned prominently as a device available to the Board.

The staff meeting of Sunday, March 16, inviting potential premium bids to enter a purchase and assumption agreement with the FSLIC, enabled Broadview to make its successful highest bid late on March 17. To argue as the Board does that the concept of receivership (resolution 80–181) does not include the method of disposition actively decided on before resolution 80–181 was adopted and formalized by the Board 50 minutes after its adoption is to apply section 1464(d)(6)(A) without regard to the indivisible fabric of facts that the Board wove between its order of receivership and its authorization of the purchase and assumption transaction with Broadview. It is determined that the issue of legality of this transaction is properly presented to the court in its adjudication of plaintiff's action to vacate the receivership.

### (2.)

After resolution 80–182 was adopted, the FSLIC as receiver executed an agreement with Broadview (purchase and assumption agreement) and an agreement of sale with the FSLIC in its corporate capacity. At the same time, the FSLIC as corporation executed an indemnity agreement with Broadview.

Under the purchase and assumption agreement, Broadview assumed and undertook to pay certain liabilities, including all deposits and savings accounts and other identified accounts. The receiver undertook to sell, and Broadview, as the assuming association, agreed to purchase, certain assets of the receiver, principally all cash and currency held by Washington Federal or the receiver; all receivables (including demand deposits) due from other financial institutions; furniture and fixtures; and all investment securities of Washington Federal or the receiver "but not including any Government National Mortgage Association mortgage-backed securities." The agreement further provided that the receiver was required to transfer and deliver to Broadview "cash equal to the difference between the book value of certain Liabilities Assumed" and the total of the assets purchased by Broadview and the premium ($25,600,000) paid by Broadview.

The obligations of the parties were conditioned upon (1) the execution of an indemnity agreement between Broadview and the FSLIC in its corporate capacity and not as receiver, and (2) upon the receiver's receipt of approval by Broadview's board of directors and an opinion by Broadview's counsel that the purchase and assumption agreement and the indemnity agreement were duly authorized, executed and delivered and constituted valid and binding obligations of Broadview. The indemnity agreement, in short, indemnified or guaranteed Broadview and held it harmless "from and against any and all claims based upon any action or inaction by Broadview under the purchase and assumption agreement and any related agreements."

Under the agreement of sale, the receiver sold to the corporation "all the receiver's right, title and interest in all those assets of Washington Federal of every kind and character that are not purchased by [Broadview] pursuant to the purchase and assumption agreement." The corporation assumed and undertook to pay and discharge liabilities of the receiver not assumed by Broadview. As consideration for its purchase of these assets, in addition to assuming liabilities of the receiver, the corporation agreed to pay to the receiver the cash equal to the amount designated as "Cash from the FSLIC" in the purchase and assumption agreement.

In enacting resolution 80–182, the Bank Board specified that it was acting pursuant to section 406 of the National Housing Act (12 U.S.C. § 1729), section 5(d) of the Home Owners Loan Act of 1933 (12 U.S.C. § 1464(d)) "and regulations issued pursuant thereto." The resolution then specified that the Board had "the authority, among other things, to liquidate or sell the assets and property of such Association."

Under 12 U.S.C. § 1464(d)(6)(D) the Board is required to "appoint only the Federal Savings and Loan Insurance Corporation as receiver for an association." Augmenting this provision, 12 U.S.C. § 1729(b)

commences, "In the event that a federal savings and loan association is in default, the corporation shall be appointed as conservator or receiver." The term *default* is defined in 12 U.S.C. § 1724(d) to mean

an adjudication or other official determination of a court of competent jurisdiction or other public authority pursuant to which a conservator, receiver, or other legal custodian is appointed for an insured institution for the purpose of liquidation.

Thus there cannot be a receivership except for "the purpose of liquidation." [45]

While under the definition of "default" the appointment of a receiver is for "the purpose of liquidation" only, section 1729(b) authorizes the FSLIC as receiver to take five actions, one through four of which do not contemplate irreversible liquidation.[46] Under the fifth alternative action of section 1729(b), the receiver may

proceed to liquidate [the association's] assets in an orderly manner, whichever shall appear to be to the best interests of the insured members of the association in default.

Defendant argues that

[w]hen Congress employed the term "liquidation," it had a flexible and expansive concept in mind, an umbrella of a concept which was intended to cover everything from continued operations, to rehabilitation, to merger, to organization of a new association, to selling of assets in a manner designed to gain a maximum return.

Plaintiff characterizes as "incredible" the Bank Board's use of the term *liquidation* to include these various alternative actions. Plaintiff argues that in its resolutions the Bank Board specifically contrasts "a liquidation (which the Board clearly contemplated would require an insurance payout) with a purchase and assumption agreement."

Analysis indicates that the Board's wording should not be so read.

 12 U.S.C. § 1728(b) relates to payments of insured accounts in insured institutions which are in default and thus, by definition, in liquidation by virtue of the appointment of a receiver. This section, however, instructs that an "insurance payout," to use the plaintiff's terminology, need not inevitably follow liquidation of an association's assets. The section provides that "payment of each insured account may be (1) by cash;" but it also provides that it may be

(2) by making available to each insured member a transferred account in a new insured institution in the same community *or in another insured institution* in an amount equal to the insured account of such insured member. [Emphasis added.]

This second method available to the FSLIC may be employed in connection with a purchase and assumption agreement entered into by the receiver and an assuming association. The insured member thereby would receive a "transferred account," fully insured, in "another insured institution."

 Therefore, when the Board's resolution 80–182 combines "liquidation of Washington Federal" with "and the payment of insurance upon its accounts," it is understood that the Board is speaking of the form of liquidation in which, under section 1728(b)(1), there is a "cash" insurance payout. The Board is not speaking of the alternative form of liquidation in which the receiver enters into a purchase and assumption agreement with an assuming association and in which, under section 1728(b)(2), insured members of the association in default receive a "transferred account," fully insured in "another insured institution."

 In resolution 80–182 the Board indicated that under the specified statutes

---

**45.** Combining, but not enlarging, part of the first sentence of section 1729(b) and section 1724(d), regulation 547.6 provides:

The Board shall appoint only the Federal Savings and Loan Insurance Corporation as receiver for a Federal association and only for the purpose of liquidation.

**46.** The receiver may (1) "take over the assets of and operate such association," (2) "take such action as may be necessary to put it in a sound and solvent condition," (3) "merge it with another insured institution," and (4) "organize a new federal savings and loan association to take over its assets."

and issued regulations the FSLIC as receiver of Washington Federal "has the authority ... to liquidate or sell the assets and property of such association." Section 1729(b)(5), which grants a receiver authority to liquidate the assets of an association in default, necessarily authorizes the receiver to sell the assets. Venerable but enduring legal authority recognizes, without so labeling, that a receiver of a national bank, empowered to sell its assets, has the right to engage in a purchase and assumption transaction as a form of liquidation. In a national bank receivership *Gockstetter v. Williams*, 9 F.2d 354 (9th Cir. 1925), affirmed the denial of an injunction to stop the sale of assets to a newly formed bank. The new bank had entered into what amounted to a purchase and assumption agreement with the receiver. With clarity and directness, the court expanded on the validity of the transaction:

> Liquidation is expensive. It always involves a shrinkage in the value of assets. Congress has therefore made provision for bringing the liquidation of the assets of national banks to an end by providing for the sale of any or all of the assets. The sale may be for cash or on terms.... What we have just said answers appellant's contention that there is no power to sell the cash already collected and available for distribution. Cash is personal property within the above definition and within the purview of the above statute. The power to sell an insolvent estate as an entirety is a power useful in *liquidating assets*, and it should not be circumscribed by a narrow construction of the statute in its application to cash and assets readily convertible into cash.[47] [Emphasis added.]

*Id.*, at 356.

In the case of national banks, as *Gockstetter* points out, "Congress has ... made

provision for bringing the liquidation of the assets of national banks to an end by providing for the sale of any or all of the assets" through revised section 5234, recodified as 12 U.S.C. § 192. But a receiver of a savings and loan association is empowered to sell assets and property of the association through authority granted by several regulations. These regulations were adopted by the Bank Board pursuant to 12 U.S.C. § 1464(d)(11), which bestows on the Bank Board "power to make rules and regulations ... for associations in conservatorship and receivership ... and for the conduct of conservatorships and receiverships."

The Board promulgated these regulations concerning the disposition of receivership assets. First, under 12 C.F.R. § 547.7 a receiver succeeds "to the rights, titles, power, and privileges of the association, and to the rights, powers, and privileges of its members, officers, and directors." There can be no question that such officers and directors have the "rights, powers, and privileges" to enter into sales agreements to dispose of assets. The receiver is hence empowered to undertake the same kind of transactions.

Second, under 12 C.F.R. § 548.2 a *conservator* is granted specific power

> (b) [to] exercise all rights and powers of the association;
>
> \* \* \* \* \* \*
>
> (*o*) [To] do such things, and have such rights, powers, privileges, immunities, and duties as the Board authorizes, directs, confers, or imposes by order or by amendment of these rules and regulations. In this section, assets or property of the association shall include any asset or property of the conservator.

These powers are then given to a *receiver* by section 549.3(a):

> assets in an orderly manner." At issue was the receiver's sale of the remaining assets of an association in default to another savings and loan association. Thus it is evident that the authority of a receiver to liquidate includes its power to sell any or all of its assets and property.

---

**47.** Consistent with the ruling in *Gockstetter, supra, Hancock Financial Corp. v. Federal Savings & Loan Ins. Corp.*, 492 F.2d 1325 (9th Cir. 1974), holds that 12 U.S.C. § 1729(b)(5)'s authority to liquidate the assets of an association in default is in accordance with the obligation of every receiver "to liquidate the receivership

The receiver, after posting notice under § 549.1, shall collect all obligations and money due the association. The *receiver may*, with respect to the association, *exercise the powers which a conservator of a Federal association may*, with or without approval of the Board or the Director and whether or not under the direction of the General Counsel of the Board, *exercise under paragraphs (a) through (f), (k), (l)*, (n), and (o) of § 548.2. In interpreting those paragraphs for purposes of this section the word "receiver" shall be read for "conservator", "receivership" for "conservatorship", and any requirement that the Board or the Director approve terms and conditions of a transaction shall not apply. [Emphasis added.]

Third, and even more specifically, section 549.3(b)(2) and (4) grant the receiver further powers to:

(2) Execute, acknowledge, and deliver any instrument necessary for any purpose, and any instrument executed under this paragraph shall be as valid and effectual as if it had been executed by the association's officers by authority of its board of directors;

\* \* \* \* \* \*

(4) *Sell for cash or on terms*, or otherwise dispose of, in whole or in part, any mortgage, deed of trust, chose in action, bond, note, contract, judgment or decree, stock, or debt owing to the association, or *any assets and property of the association*. [Emphasis added.]

 Hence it is found and determined that pursuant to 12 U.S.C. § 1729 and 12 U.S.C. § 1464(d)(11) and the designated regulations "issued pursuant thereto," the FSLIC as receiver of Washington Federal "ha[d] the authority, among other things, to liquidate or sell the assets and property of such association."

It is not disputed that prior to the addition of 12 U.S.C. § 1729(f)(2) to the National Housing Act by means of the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub.L.No. 95–630, 92 Stat. 3641, 95th Cong., 2nd Sess. (the "1978 amendment"), the FSLIC in its corporate capacity lacked the authority to enter into any indemnity agreement as part of a purchase and assumption agreement. Without that 1978 amendment, the FSLIC lacked the authority to make payments for its purchase of assets of an association in default whose liabilities were being assumed by another insured association.

Plaintiff does not challenge the authority of FSLIC in its corporate capacity, pursuant to 12 U.S.C. § 1729(f), to act as it did. To the extent pertinent, the section provides:

Whenever an insured institution is in default or, in the judgment of the Corporation is in danger of default, the Corporation may, in order to facilitate ... the sale of the assets of such insured institution and the assumption of its liabilities by another insured institution and upon such terms and conditions as the Corporation may determine, purchase any such assets or assume any such liabilities ... or guarantee such other insured institution against loss by reason of its ... assuming the liabilities and purchasing the assets of such insured institution in or in danger of default.

Plaintiff Washington Federal notes that this language "is very similar to [12 U.S.C.] § 1823(e)." This latter section empowers the Federal Deposit Insurance Corporation (Corporation) to act as follows:

Whenever in the judgment of the Board of Directors such action will reduce the risk or avert a threatened loss to the Corporation and ... will facilitate the sale of the assets of an open or closed insured bank to and assumption of its liabilities by another insured bank, the Corporation may, upon such terms and conditions as it may determine ... purchase any such assets or may guarantee any other insured bank against loss by reason of its assuming the liabilities and purchasing the assets of an open or closed insured bank.

Section 1823(e) concludes with a sentence not contained in section 1729(f)(2). It reads:

Any insured national bank or District bank, or the Corporation as receiver thereof, is authorized to contract for such sales or loans and to pledge any assets of the bank to secure such loans. . . .

Plaintiff argues that this last sentence "specifically grants to the FDIC as receiver the power to execute a P&A." It says that the failure of Congress "to insert into section 1729(f)(2) language similar to that of § 1823(e) providing for the FDIC to act in its capacity as receiver indicates that Congress did not contemplate that the FSLIC as *receiver* would have the power now claimed by the FHLBB to enter into a P&A transaction." Neither plaintiff's counsel nor defendants' counsel quotes any comment of a congressman or senator with reference to the 1978 amendments to 12 U.S.C. § 1729(f). Nor does this court's scanning of the hearing proceedings in which Bank Board representatives testified, uncover any comment by any member of Congress.[48] The complete absence of any congressional comment on the addition of 12 U.S.C. § 1729(f)(2) undermines the basis from which plaintiff seeks to infer congressional intent to deny authority to the FSLIC as receiver to enter into a P&A by reason of section 1729(f)(2)'s not containing the last sentence of the language of 12 U.S.C. § 1823(e).

Both sides refer to the testimony of Daniel Goldberg, acting general counsel for the FHLBB. He made a short oral statement and filed a long written statement with the Senate Committee on Banking, Housing and Urban Affairs. · *See* Hearings on S.71, 95th Cong., 1st Sess. 83, 100–104, 134–35 (1978). His statement includes this paragraph:

The proposed alteration would give the FSLIC power that the FDIC already possesses as exercised in many cases under the first paragraph of subsection (e) of 12

U.S.C. § 1823.[5] The need for this amendment is demonstrated by the FDIC's handling of the failed Franklin National Bank in 1974.

---

[5] [The first paragraph of 12 U.S.C. [§] 1823(e) is quoted in full in his statement as a footnote.]

Pertinent to an understanding of Mr. Goldberg's statement is Judge Judd's *ex parte* order in *In re Franklin National Bank*, 381 F.Supp. 1390 (E.D.N.Y.1974). The FDIC as receiver had requested approval of a purchase and assumption agreement between the receiver and the purchasing bank. Judge Judd noted that the receiver of a national bank is given authority to sell the assets by 12 U.S.C. § 192 "upon the order of a court of record of competent jurisdiction." However, the judge ruled that approval of a sale under section 192 and the ratification of its terms represented "a purely administrative act by the court." Finding both "precedent and practicality" supporting the petition for *ex parte* approval, he signed the order submitted by the FDIC (obviously submitted to him in both its corporate and receivership capacities).

With the absence of any congressional expression of intent, all that is available in the Senate's history of the amendment to section 1729(f) is the statement of associate general counsel Goldberg. It is evident by his citation of the FDIC's "handling of the failed Franklin National Bank in 1974," in which the judge approved a purchase and assumption agreement between the FDIC as receiver and the purchasing bank, that he was telling the Senate Committee that the proposed amendment would permit the FSLIC to engage in purchase and assumption transactions. Just as chairman McKinney stressed to the House Sub-Committee on Financial Institutions, Supervision, Regulation and Insurance, counsel Goldberg stressed the need for the FSLIC to have the

---

48. Pub.L. 95–630 the "Financial Institution's Regulatory and Interest Rate Control Act of 1978," makes numerous changes and adds new sections requiring 100 pages in the United States Statutes at Large. *See* 92 Stat. 3641–3741. This act comprises twenty different titles including such diverse subjects as "Super-

visory Authority Over Depository Institutions," "American Arts Gold Medallions," and "Credit Union Restructuring." With the multitude of matters that make up this omnibus act, it is not surprising that it contains no comments about the amendments to Title XII, section 1729(f), a very small part of the total act.

power to guarantee (*i. e.*, indemnify) the assuming association from loss by reason of undertaking the purchase and assumption agreement. Surely Mr. Goldberg sought to convey to the committee that the FSLIC as receiver—like the FDIC as receiver in the *Franklin National Bank* case—would be able to engage in the purchase and assumption agreement with an assuming association. Certainly the presentations of chairman McKinney before the House Committee and counsel Goldberg before the Senate Committee gave no basis for Congress to conclude that the absence of the last sentence of 12 U.S.C. § 1823(e) from the proposed amendment to section 1729(f) should be given any significance.

In support of its argument, plaintiff further relies on language in *First Empire Bank v. Federal Deposit Insurance Corp.*, 572 F.2d 1361 (9th Cir. 1978). Holders of standby letters of credit issued by United States National Bank of San Diego, insolvent and in receivership, sued the Federal Deposit Insurance Corporation. Upon its appointment as receiver of USNB, the FDIC entered into a purchase and assumption agreement with Crocker National Bank. Crocker purchased selected assets of USNB and assumed certain of the Bank's obligations, including deposit accounts, but not the plaintiff's letters of credit.

Plaintiffs (appellants) contended that the purchase and assumption agreement amounted to a preference of the creditors whose obligations were assumed. They said that they were entitled to ratable distribution under 12 U.S.C. § 194 and appealed from a judgment in favor of the FDIC.

The court of appeals reversed and remanded for an entry of judgment in favor of the plaintiffs. The FDIC cross-appealed from a judgment that the letters of credit were provable claims. The court of appeals denied its appeal.

As one of its arguments the FDIC in its corporate capacity urged that section 1823(e) applied to the FDIC as receiver and not as corporation. The FDIC rested this argument on the last sentence of the paragraph. The court ruled:

> The FDIC points to the final sentence of the first paragraph of section 1823(e), set forth above, as indicating that the subsection has the Receiver in mind throughout and that the emphasized clause thus should apply to acts of the Receiver. We do not so read it. That sentence serves to enable closed or failing banks to contract with the Corporation and includes in its enablement the FDIC as Receiver of such banks. Thus the receiver is taken note of only insofar as to recognize that it can contract with the corporation.[49] It is not, however, excused from behaving like a receiver when it does so act.

*Id.*, at 1370–71.

When the court says that this last sentence recognizes only that the receiver "can contract with the corporation," it is not saying, as plaintiff argues, that the last sentence of section 1823(e) authorizes the FDIC as receiver to enter into a purchase and assumption agreement. The court then recounts the history of purchase and assumption agreements:

> The FDIA did not create the concept of the purchase and assumption agreement. Before the FDIC was created, receivers of insolvent banks had entered into purchase and assumption agreements under the provisions of the NBA authorizing receivers to deal with receivership assets: 12 U.S.C. §§ 192, 194. See, *Gockstetter v. Williams, [supra]; Ex parte Moore*, 6 F.2d 905, 906–07 (E.D.S.C.1925); *Hulse v. Argetsinger*, 18 F.2d 944 (2nd Cir. 1927). Congress in enacting the FDIA thus noted a pre-existing practice.

---

**49.** Defendants suggest "that under the statutory scheme governing national banks, and but for the last sentence in the first paragraph of 12 U.S.C. § 1823(e), the FDIC may be required to seek a court order *before* it can sell the assets of a bank." That is exactly what the FDIC as receiver, did in *In re Franklin National Bank, supra.* 12 U.S.C. § 192 clearly requires court approval although, as Judge Judd stated, approval may be granted by an administrative order on an *ex parte* basis. It seems unlikely that Congress could have intended that the last sentence of section 1823(e) repealed by implication the court approval requirement of 12 U.S.C. § 192. The *First Empire Court* in its opinion makes no such suggestion.

*Id.*, at 1371. Section 1729(f)(2) authorizes the FSLIC in its corporate capacity to enter into a purchase and assumption agreement with a sound association which takes over a failing association with its consent. *First Empire* speaks of the FDIC's use of this practice:

> One form of relief often resorted to for this purpose [averting the closure of a failing bank] is the purchase and assumption agreement. By such an agreement the Corporation encourages the failing bank to agree to a takeover of its business by a sound bank.

572 F.2d at 1364. But plaintiff argues that while the FSLIC has authority under section 1729(f)(2) to purchase Washington Federal's assets from the receiver, the receiver does not have authority to sell any of those assets to the corporation. Section 1729(f)(2) reflects no congressional intent to authorize only one-half of the transaction.

However, in any event, section 1729(f)(2) need not be read alone. Under 12 U.S.C. § 1464(d)(6)(D), the FSLIC in its corporate capacity is given "power to buy at its own sale as receiver, subject to approval by the Board." This provision empowers the receiver to enter into an agreement of sale with the corporation, just as it also authorizes the corporation to enter into an agreement of purchase with the receiver. In the words of the *First Empire* court, the receiver "can contract with the corporation." Thus, section 1464(d)(6)(D) supplies the same authority as the last sentence of section 1823(e) as construed by the *First Empire* court.

Upon the grounds stated and for the reasons given, it is found and determined that the FSLIC as receiver was authorized to enter into a purchase and assumption agreement with Broadview Savings and Loan. The FSLIC in its corporate capacity was authorized to enter into a sales agreement with the FSLIC as receiver and into an indemnity agreement with Broadview. It is also found and determined that the FSLIC as receiver was authorized to enter into the sales agreement with the FSLIC in its corporate capacity. In short, it is found and determined that the purchase and assumption transaction was in accordance with law and the Bank Board did not act arbitrarily or capriciously in approving the several agreements.[50]

## VI.

Plaintiff relies upon the "documents comprising the administrative record" to argue:

> One of the important considerations for the Board members in electing what avenue to pursue with respect to Washington Federal was the cost to the FSLIC of the alternative eventually selected ... But ... the Board members were not given ... accurate information and their judgment was thus tainted by the staff's distorted presentation of the true cost of the FSLIC plan.

Plaintiff bases its argument upon the $115 million "total cost" of the P&A alternative set forth in the document before the Board entitled "Outline of Alternatives." Plain-

---

**50.** Plaintiff has at various points raised the issue of the Bank Board's approval of a *stock* company, Broadview, acquiring the assets and assuming deposit and certain other liabilities of a *mutual* association, Washington Federal. Plaintiff suggests that because of this transaction, its depositors were deprived of equity in the Association in the form of the $12 million net worth declared by the Association in its last monthly report (2/29/80).

The depositors of a mutual savings and loan association have essentially no interest beyond that of "creditors of the association and only secondarily as equity owners." *York v. Federal Home Loan Bank Board*, 624 F.2d 495, 500 (4th Cir. 1980). To the extent that the depositors assert an interest in anything beyond their deposits, the Supreme Court has disposed of the argument thus:

> If a depositor withdraws from the bank, he receives only his deposits and interest. If he continues, his only chance of getting anything more would be in the unlikely event of a solvent liquidation, a possibility that hardly rises to the level of an expectancy. It stretches the imagination very far to attribute any real value to such a remote contingency, and when coupled with the fact that it represents nothing which the depositors can readily transfer, any theoretical value reduces almost to the vanishing point.

*Society for Savings v. Bowers*, 349 U.S. 143, 150, 75 S.Ct. 607, 611, 99 L.Ed. 950 (1955).

tiff argues that the "total cash loss was over $360 million" and that the $115 million was an "illusory" present value discount. In essence, plaintiff is arguing that had the Board known the total cash loss and understood the cost of Washington Federal's plan, it might have chosen the latter over the former. Plaintiff concludes:

> Had that information been presented to the Bank Board members then it could have exercised its judgment concerning the most economical alternative to remedy the Washington Federal situation. Without that information, the Board's decision constituted an abuse of discretion.[51]

Once again it is necessary here to look at the scope of review applicable to this action as defined by the court. The issue before the court is whether the Bank Board, having considered the relevant factors as defined by the court, abused its discretion in appointing a receiver for Washington Federal. The Board need have considered only those factors which "may be subsumed under 'one or more' grounds that form the basis of the Bank Board's 'opinion' to order a receivership." Pursuant to the court's ruling in parts I.B. and IV.D., the relevant factors which the Board was required to consider would be those "subsumed" under the first ground, i. e., Washington Federal was in an unsafe and unsound condition to transact business.

■ The question, then, is whether the cost of the various alternatives is a relevant factor which the Board should have considered when making its receivership decision. The court finds that it is not. The factor pertinent to the "unsafe and unsound" ground was the Association's true

financial condition in March 1980. Neither the projected cost of Washington Federal's "plans" or "proposal" nor the estimated costs of the alternatives was relevant to the Association's "true condition." The court made findings in IV.B. which support the Bank Board's action; none of those findings is related to the costs of the choices before the Board.

In part V. the court determined that under the facts of this case the legality of the P&A transaction is within the scope of the court's review. It is necessary, then, to see if the applicable statutory provisions require the Bank Board to undertake a cost comparison. The only reference to costs appears in 12 U.S.C. § 1729(f)(3):

> (3) No contribution or guarantee shall be made pursuant to paragraphs (1) or (2) of this subsection in an amount in excess of that which the Corporation finds to be reasonably necessary to save the cost of liquidating such insured institution in or in danger of default, but if the Corporation determines that the continued operation of such institution is essential to provide adequate savings or home financing services in its community, such limitation upon the amount of a contribution or guarantee shall not apply.

In any contribution made or contemplated under section 1729(f)(1),[52] the cost of such contribution must be compared with the "cost of liquidating such insured institution in or in danger of default." Such cost of liquidation is construed to refer to liquidation in which, pursuant to section 1728(b)(1), "payment of each insured account" in any insured institution in de-

---

**51.** Defendants respond that the "bottom-line" numbers based upon the calculations of Edward J. McGuirk and presented to the Board showed "that the cost of a payout of insurance and conventional liquidation, properly discounted to its present value . . ., would be *higher* than the cost of the purchase and assumption transaction." That comparison, defendants argue, and not one involving the cost of Washington Federal's plans, is all that is required by statute.

Because of the resolution of the issue as a matter of law, it is unnecessary to consider whether the comparative cost figures presented

by Mr. McGuirk to the Board were rationally based in fact.

**52.** 12 U.S.C. § 1729(f)(1) reads as follows:

> In order to prevent a default in an insured institution or in order to restore an insured institution in default to normal operation, the Corporation is authorized, in its discretion and upon such terms and conditions as it may determine, to make loans to, to purchase the assets of, or to make a contribution to, an insured institution or an insured institution in default.

fault is "made by the corporation ... (1) by cash."

Neither expressly nor by inference does (f)(3) require that before liquidating an association the corporation must first determine that it would cost less to liquidate than to attempt to avoid default or to restore the institution to normal operation through loans or contributions. A different situation arises when the Board considers making a contribution or loan to an association under (f)(1) rather than pursuing liquidation. Section 1729(f)(3) establishes a control on the corporation's flow of funds solely when the corporation, under (f)(1), decides to make contributions or loans to an ailing association. Only then must the corporation make the cost comparison with liquidation (and insurance payout) directed by (f)(3). Since the Bank Board decided on March 14, 1980 not to make contributions or loans to Washington Federal, the corporation was not required to make any cost comparison by virtue of (f)(1) and (f)(3).

In (f)(3) it is further provided that no "guarantee" shall be made under (f)(2) [53] unless the cost comparison provided in (f)(3) is first made. Given the meaning to the word "guarantee" dictated by the lexicon of (f)(2), it is evident that the word refers to the "guarantee" of "such other insured institution against loss by reason of its ... assuming the liabilities and purchasing the assets of such insured institution in or in danger of default." It would stretch the meaning of the word *guarantee* beyond the intent disclosed in (f)(2) to embrace within that word the cost to the corporation of purchasing "any such assets" or assuming "any such liabilities" or making "loans to such other insured institution" that might arise under a purchase and assumption agreement and a related agreement of sale with the receiver.

Ascribing the (f)(2) meaning to the word *guarantee*, it is apparent that in this case the purchase and assumption agreement read together with the indemnity agreement executed by the FSLIC as corporation quantifies only contingent costs. Hence any cost comparison, if one is required to be made, would not show that the cost of the "guarantee" under the purchase and assumption agreement and the indemnity agreement exceeded what would have been the cost of liquidating Washington Federal with an insurance payout.

■ Because the Board was not required to consider cost as a relevant factor in determining whether Washington Federal was in an "unsafe and unsound condition," and because section 1729(f)(3) does not require a "cost test" comparison of the alternative methods of disposition of Washington Federal which were placed before the Board, it is concluded that the Bank Board's determination under resolutions 80–182 and 80–183 to approve the several agreements was neither arbitrary nor capricious and its actions were in accordance with law.

## VII.

Upon the findings and determinations made herein and having concluded that Washington Federal has failed to sustain its burden of proving that in ordering a receiver on its first ground the Bank Board acted arbitrarily, capriciously and not in accordance with law, judgment is entered against Washington Federal and in favor of the Bank Board on Count I.

By reason of said ruling, at least some of the remaining counts of plaintiff's complaint would appear to have been collaterally adjudicated. The court reserves ruling

**53.** 12 U.S.C. § 1729(f)(2) reads as follows:

Whenever an insured institution is in default or, in the judgment of the Corporation, is in danger of default, the Corporation may, in order to facilitate a merger or consolidation of such insured institution with another insured institution or the sale of the assets of such insured institution and the assumption of its liabilities by another insured institution

and upon such terms and conditions as the Corporation may determine, purchase any such assets or assume any such liabilities, or make loans to such other insured institution, or guarantee such other insured institution against loss by reason of its merging or consolidating with or assuming the liabilities and purchasing the assets of such insured institution in or in danger of default.

on defendants' motion to dismiss Counts II through X until counsel are given an opportunity to state their positions. A hearing is scheduled for September 4, 1981 at 1:30 p. m.

On June 26, 1981, the plaintiff submitted to the court its application for an "interim award of attorneys' fees and expenses," which the court was asked "to hold *in camera* until such time as the Court is prepared to deal with the merits of the Application." The original application may now be filed, and defendants may respond.

IT IS SO ORDERED.